# United States Court of Appeals
## For the First Circuit

No. 04-1755

UNITED STATES OF AMERICA,

Appellee,

v.

JEAN BRITO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Reginald C. Lindsay, U.S. District Judge]

Before

Selya, Circuit Judge,

Coffin, Senior Circuit Judge,

and Howard, Circuit Judge.

Catherine K. Byrne, Federal Defender Office, for appellant.
Cynthia A. Young, Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, was on brief, for appellee.

October 20, 2005

**SELYA**, **Circuit Judge**.  In <u>Crawford</u> v. <u>Washington</u>, 541 U.S. 36 (2004), the Supreme Court barred the admission of testimonial hearsay in a criminal case under circumstances in which the accused has not had an opportunity to cross-examine the declarant.  This ruling effected a sea change in the jurisprudence of the Confrontation Clause — but the Court left open the parameters of testimonial hearsay, and so its ruling produced a miasma of uncertainty.  We enter this murky milieu to answer a question of first impression in this circuit:  under what circumstances should an excited utterance made to a police officer (in this case, a 911 operator)  be considered testimonial?  Although the question is close, we conclude that, in the circumstances at hand, the excited utterance was nontestimonial and, therefore, properly admitted into evidence.  We also reject the defendant's other challenges to his conviction and sentence.  Consequently, we affirm the judgment below.

## I.  BACKGROUND

In the early morning hours of February 9, 2003, gunshots rang out in the parking lot of Boomer's, a saloon in Brockton, Massachusetts.  At that time Robert Manoli, who was working late in his nearby office, peered out the window and saw a hat-wearing black man load a clip into a gun.  As the man walked away, Manoli dialed 911 and reported his observations.  The 911 operator

dispatched Brockton police officers Steven Johnson and Scott Landry to the scene.

Immediately thereafter, a second 911 call came through. The caller, an anonymous woman, asked if she was talking to the Brockton police.  When the 911 operator responded affirmatively, the following dialogue ensued:

**Caller:**  Listen to me.  I just seen a man with a gun in his hand.  It's at that club called Boomers.  There was a shooting there just a second ago.  He has on a black cap with a black leather coat.  I can't quite remember the color of his sweater.  But I was just saying to my son when I was getting in the car that I didn't come to Brockton to die.  And when I was pulling out and backing out driving down the street, he pointed a gun at me and acted like he was shooting at my car.

**Operator:**  Is he a black man?

**Caller:**  Yes, he is a black man.  He has on a baseball cap, he looks like he might be between the height of 5'8" and 5'10".  But he's there right now, he's standing in between like two

-3-

|  |  | buildings. He's basically on Perkins Ave., right beside [the club Boomers].[1] |
|---|---|---|
| **Operator:** |  | Okay, we're on our way down there. I'll tell the officers to look for a guy with a black cap, black leather coat, about 5'8". |
| **Caller:** |  | Yes, please do. [H]e has the coat unzipped. And it looked like a nine millimeter. I could be wrong but it looked like a nine. |

The 911 operator relayed the augmented description of the suspect to Johnson and Landry (who were en route to Boomer's). When the officers were about a block away, they saw a 5'8" black male, wearing a black hat and jacket, standing next to the open passenger door of a car. The man's right hand was hidden inside his unzipped jacket, as if he were holding something.

The man spied the policemen and fled. His right hand remained inside his jacket. Officer Johnson gave chase. While he was in hot pursuit, his quarry threw away a 9 millimeter pistol. The pistol slid off a snow-covered roof and landed on the ground near Johnson's feet. Johnson radioed his dispatcher to report the location of the gun and continued the chase.

---

[1]The transcript used as an aid at trial excluded the bracketed words, but they are audible on the tape itself.

Within a matter of seconds, Johnson tackled the fleeing man (later identified as defendant-appellant Jean Brito). Assisted by two newly arrived detectives, Johnson took the suspect into custody. The police then retrieved both the gun and the suspect's hat (which had fallen during the chase). The police also found shell casings and an empty magazine clip near the parking lot. The shell casings matched the retrieved pistol.

On March 26, 2003, a federal grand jury indicted the appellant on one count of possession of a firearm by a convicted felon and one count of possession of a firearm by an illegal alien. See 18 U.S.C. § 922(g)(1), (g)(5)(A). The only issue at trial was whether the appellant possessed a gun (he stipulated that he was both a convicted felon and an illegal alien). The government's case in chief consisted of Manoli's testimony, the tape of his 911 call, and the testimony of various police officers who had been involved in the investigation. That evidence tracked the factual account set out above.

The appellant testified in his own behalf. He said that, earlier in the day, he had purchased a gold chain from two men in a bar. Shortly thereafter, two other men confronted him. One of them claimed to own the chain and demanded its return. The appellant offered to sell it to the alleged owner. The latter, who did not have sufficient funds to effect a purchase then and there, took down the appellant's contact information.

Around 1:00 a.m., the same man showed up in Boomer's parking lot with three compatriots. They invited the appellant to enter their car, but he refused. As the appellant turned to walk away, he heard gunshots. That prompted him to run and hide in some nearby bushes. He remained in hiding until he heard police sirens. At that point, he emerged from the bushes, only to be tackled by police officers and arrested. He denied that a chase had occurred. He also denied that he had a pistol in his possession at any time.

On cross-examination, the government sought to use the appellant's three prior felony drug-trafficking convictions for impeachment purposes. When the appellant objected, the trial court, at sidebar, proposed that the government be allowed to inquire as to the number of felony convictions without describing the crimes. Defense counsel refused this compromise and suggested that the government be limited to asking whether the appellant had "committed a crime" on a certain date. The court rejected this approach, overruled the objection, and offered the appellant a choice: in referring to the prior convictions, the government either could use the word "felony" or could name the charge. Defense counsel refused to choose. The court then ruled that the government, in its cross-examination, could identify each charge.

Cross-examination proceeded. Defense counsel belatedly asked the court to circumscribe the government's references to the prior convictions so that only the word "felony" would be used.

-6-

The court demurred, saying that the attorney had been given that option but had failed to exercise it in a timely manner. The prosecutor then established that the appellant had been convicted on three separate occasions in 1994 — once for distribution of a controlled substance and twice for possession of controlled substances with intent to distribute.

After the defense rested, the government sought to introduce the anonymous 911 tape as part of its rebuttal case. The appellant objected on hearsay and Confrontation Clause grounds. The court redacted the tape to exclude the caller's description of the pistol and allowed the remainder of the tape into evidence under the "excited utterance" exception.[2] Because Crawford had not yet been decided, the district court's overruling of the objection comported with the then-prevailing view of the Confrontation Clause, which permitted the admission in a criminal case of an out-of-court statement of an unavailable witness as long as it fell "within a firmly rooted hearsay exception" or otherwise bore "particularized guarantees of trustworthiness." Ohio v. Roberts, 448 U.S. 56, 66 (1980). The court found that the main portion of the 911 tape qualified as an excited utterance and that the exception for excited utterances was a firmly rooted hearsay

_____

[2]The government initially had indicated an intention to offer the tape of the anonymous 911 call during its case in chief. The parties' arguments were aired fully at that time, and the district court previewed the basis for its eventual ruling.

exception. See Fed. R. Evid. 803(2) (confirming that exception and defining an excited utterance as a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition"); Puleio v. Vose, 830 F.2d 1197, 1206 (1st Cir. 1987) (classifying the hearsay exception for excited utterances as "firmly rooted").

At the conclusion of the trial, the court gave a carefully phrased instruction making clear that the prior felony convictions were relevant only insofar as they bore on the appellant's credibility. The appellant did not take exception to this, or any other, portion of the court's charge. The jury found the appellant guilty on both counts. The district court subsequently imposed a 210-month incarcerative sentence. This appeal followed.

## II. ANALYSIS

We divide our analysis into three parts, corresponding with the appellant's three assignments of error.

### A. **The Anonymous 911 Tape**.

The appellant's primary contention is that the redacted tape of the second 911 call should not have been admitted into evidence as he was not able to confront and cross-examine the anonymous speaker. This contention derives from the Sixth Amendment, which provides in pertinent part that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be

confronted with the witnesses against him." U.S. Const. amend. VI. In _Crawford_, decided approximately one month after the jury verdict in this case, the Supreme Court fundamentally altered the jurisprudence of the Sixth Amendment and took a new approach to determining whether the admission, in a criminal case, of an out-of-court statement by an unavailable declarant violates an accused's right of confrontation. See _Horton_ v. _Allen_, 370 F.3d 75, 83 (1st Cir. 2004).

Pertinently, the _Crawford_ Court decreed that, as to "testimonial" statements, the Confrontation Clause assures a procedural right to confrontation rather than a substantive guarantee of evidentiary reliability. See _Crawford_, 541 U.S. at 61 (holding, with respect to such statements, that the Confrontation Clause demands "not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination"). As to such statements, the _Crawford_ Court derided the rule of _Roberts_, which it characterized as "[d]ispensing with confrontation because testimony is obviously reliable," as being "akin to dispensing with jury trial because a defendant is obviously guilty." _Id._ at 62.

The Court limited its critique of _Roberts_ and its freshly minted procedural right to testimonial statements, basing this limitation upon an examination of both the historical background and the text of the Confrontation Clause. See _id._ at 43-51. It

offered no precise definition of which statements were to be regarded as testimonial and which were not. Instead, it observed that the answer to that question would depend heavily on the nature and context of a given statement. See id. at 51 (noting that an "accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not").

The Court then enumerated, for illustrative purposes, a trio of formulations that came within the "core class" of testimonial statements. Id. at 51-52. We rehearse these illustrations.

The first formulation encompasses "ex parte in-court testimony or its functional equivalent — that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially." Id. at 52. The second encompasses "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions." Id. at 51-52 (citation and internal quotation marks omitted) (alteration in original). The third encompasses "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Id. at 52 (citation and

internal quotation marks omitted). In the Court's view, these three formulations all shared a common conceptual nucleus and mapped out the coverage of the Confrontation Clause at differing levels of abstraction around that nucleus. See id.

The Court went on to note that these formulations overlapped and that some statements might fall within any plausible definition of "testimonial." Id. A statement made during grand jury testimony is an example of this phenomenon. Id. So, too, statements given in response to police interrogation would qualify under any of the Court's stated formulations. Id. In this regard, the Court cautioned that it used the term "interrogation" in its colloquial sense, but hastened to add that a statement "knowingly given in response to structured police questioning" would qualify "under any conceivable definition" of interrogation. Id. at 53 n.4.

Against this backdrop, the appellant asseverates that the entirety of the statements made during the anonymous 911 call should be deemed testimonial (and, thus, inadmissible) because the caller knowingly contacted the police to furnish information about a crime.[3] He invokes the third Crawford formulation and posits that an objectively reasonable caller would have understood that her statements would be available for use at a later trial. His

---

[3]On appeal, the appellant does not challenge the district court's finding that the second 911 call qualified as an excited utterance.

fallback position is that, at the very least, the statements following the 911 operator's initial question should be considered testimonial because that portion of the colloquy was the product of police interrogation. We review de novo the question of whether or not a given statement, in context, should be deemed testimonial. See United States v. Tse, 375 F.3d 148, 159 (1st Cir. 2004); see also United States v. Perez-Ruiz, 353 F.3d 1, 11 (1st Cir. 2003).

The Supreme Court's illustrative formulations suggest that a 911 call that does nothing more than impart a factual account of past criminal activity would constitute testimonial hearsay. After all, the police record and preserve incoming 911 calls for, among other things, potential prosecutorial use. Most people not only understand this fact but also understand that because 911 is a pathway to contacting the police in emergency situations, such communications are to be taken seriously. Cf., e.g., N.H. Rev. Stat. Ann. § 106-H:13 (criminalizing the purposeful reporting of false information to a 911 dispatcher). Emphasizing these facts, many courts have classified 911 calls of this nature as functionally equivalent to formal statements to the police. See, e.g., United States v. Arnold, 410 F.3d 895, 903 (6th Cir. 2005); People v. Cortes, 781 N.Y.S.2d 401, 405-06 (N.Y. Sup. Ct. 2004); see also Richard D. Friedman & Bridget McCormack, Dial-In-Testimony, 150 U. Pa. L. Rev. 1171, 1242 (2002).

At first blush, it may seem that the anonymous 911 call at issue here fits this mold. We think not. Although the call provided a detailed report of criminal activity (including a description of the suspect and information as to his whereabouts), there is more to the story. The district court supportably found that the call qualified as an excited utterance. In this instance, that fact makes a dispositive difference.

The case law in this nascent field is muddled as to whether excited utterances may or may not be classified as testimonial hearsay. The decisions fall into three camps. We briefly describe each such line of authority.

Some courts take the view that excited utterances never can constitute testimonial hearsay. Their rationale is that, by definition, an excited utterance is made under the influence of a startling event and, thus, the declarant acts in response to that event rather than in response to interrogation or in anticipation of bearing witness. See, e.g., United States v. Brun, 416 F.3d 703, 707 (8th Cir. 2005) (holding that excited utterances are not testimonial in nature because they are "emotional and spontaneous rather than deliberate and calculated"); People v. Moscat, 777 N.Y.S.2d 875, 880 (N.Y. Crim. Ct. 2004) (holding that an excited utterance is a cry for help and, therefore, not functionally equivalent to "a formal pretrial examination"). In each of these cases, the court upheld the admission of an "excited" 911 call in

-13-

a criminal trial notwithstanding the declarant's unavailability. See Brun, 416 F.3d at 707; Moscat, 777 N.Y.S.2d at 880.

A second cluster of cases holds that the excited nature of the utterance has no bearing on whether a particular statement is testimonial. These courts effectively discount the excited nature of the utterance and focus instead on the declarant's objectively reasonable expectations. See, e.g., Arnold, 410 F.3d at 903 (holding that, notwithstanding the excited nature of a 911 call, the declarant reasonably could expect that statements describing the crime and the perpetrator would be used prosecutorially); Cortes, 781 N.Y.S.2d at 415 (holding that all "[c]alls to 911 to report a crime are testimonial," even if they also qualify as excited utterances, because "the purpose of the information is for investigation, prosecution, and potential use at a judicial proceeding"). In each of these cases, the court ruled inadmissible in a criminal trial an "excited" 911 call due to the declarant's unavailability. See Arnold, 410 F.3d at 904; Cortes, 781 N.Y.S.2d at 416.

A third cadre of courts recognizes that the excited utterance inquiry and the testimonial hearsay inquiry are distinct but symbiotic; the startling event that gives rise to an excited utterance informs the Confrontation Clause analysis and often dissipates the very qualities of a statement that otherwise might render the statement testimonial. See, e.g., Arnold, 410 F.3d at

-14-

914 (Sutton, J., dissenting) (reasoning that a frightened 911 caller rarely will have the state of mind needed to make a "solemn declaration" or a statement that he or she "would reasonably expect to be used prosecutorially"); State v. Wright, 701 N.W.2d 802, 811 (Minn. 2005) (finding 911 call nontestimonial when declarant was "trembling, stuttering, crying [and] hyperventilating during the call") (internal quotation marks omitted) (alteration in original); State v. Hembertt, 696 N.W.2d 473, 483 (Neb. 2005) (holding excited utterances made to officers during an ongoing threat to be nontestimonial because those utterances were "not made in anticipation of eventual prosecution" but "to assist in securing the scene and apprehending the suspect"); Drayton v. United States, 877 A.2d 145, 149-50 (D.C. 2005) (similar). This approach suggests that courts must undertake a case-by-case examination of the totality of the circumstances in order to determine whether or not a particular excited utterance should be deemed testimonial in nature.

We reject both per se approaches — the one that automatically exempts all excited utterances from classification as testimonial hearsay and the one that effectively disregards the excited nature of an utterance. Rule 803(2) allows the admission of excited utterances based on the theory that a person speaking about a startling event, while still under the stress of experiencing or observing that event, normally does not have either

-15-

the capacity or the incentive to prevaricate. See, e.g., United States v. Taveras, 380 F.3d 532, 537 (1st Cir. 2004). It makes very little sense, then, to impute a calm and reasoning state of mind to every such declarant. It does not necessarily follow, however, that just because a statement falls within the literal definition of an excited utterance, the declarant must have lacked the ability to recognize that the statement could be used for prosecutorial purposes. See, e.g., Lopez v. State, 888 So.2d 693, 699-700 (Fla. Dist. Ct. App. 2004) (acknowledging that a declarant's excited state "has a bearing on his expectation regarding the potential use of his statement in court" but nonetheless finding the excited utterance in question testimonial). A wide variety of situations can give rise to excited utterances. If, say, the utterance is removed in time from the startling event, it might qualify as excited, see, e.g., United States v. Scarpa, 913 F.2d 993, 1017 (2d Cir. 1990), but still might be considered testimonial. Cf. Crawford, 541 U.S. at 58 n.8 (implying that a statement of a child victim elicited during after-the-fact police questioning was testimonial despite the fact that it was a "spontaneous declaration").

We therefore reject the categorical approaches that lie at either end of the spectrum. Instead, we conclude that the excited utterance and testimonial hearsay inquiries are separate, but related. While both inquiries look to the surrounding

-16-

circumstances to make determinations about the declarant's mindset at the time of the statement, their focal points are different. The excited utterance inquiry focuses on whether the declarant was under the stress of a startling event. The testimonial hearsay inquiry focuses on whether a reasonable declarant, similarly situated (that is, excited by the stress of a startling event), would have had the capacity to appreciate the legal ramifications of her statement.

These parallel inquiries require an ad hoc, case-by-case approach. An inquiring court first should determine whether a particular hearsay statement qualifies as an excited utterance. If not, the inquiry ends. If, however, the statement so qualifies, the court then must look to the attendant circumstances and assess the likelihood that a reasonable person would have either retained or regained the capacity to make a testimonial statement at the time of the utterance.[4]

We offer some general guidance for the proper application of this rule. Ordinarily, statements made to police while the declarant or others are still in personal danger cannot be said to have been made with consideration of their legal ramifications. Such a declarant usually speaks out of urgency and a desire to

---

[4]This case involves an excited utterance. The analytic framework that we suggest will, however, apply generally to statements alleged to come within other firmly rooted hearsay exceptions.

obtain a prompt response. It follows, therefore, that such statements will not normally be deemed testimonial. See Hembertt, 696 N.W.2d at 483. Once the immediate danger has subsided, however, a person who speaks while still under the stress of a startling event is more likely able to comprehend the larger significance of her words. If the record fairly supports a finding of comprehension, the fact that the statement also qualifies as an excited utterance will not alter its testimonial nature. See Drayton, 877 A.2d at 149-50.

As a final matter, we caution against the use of an "all or nothing" approach to the admission or exclusion of 911 calls. It is entirely possible that some portions of a 911 call may qualify as excited utterances, while others do not. Similarly, some portions may be deemed testimonial, while others may be deemed nontestimonial. This means, of course, that some parts of a single 911 call may run headlong into the Crawford bar, while others do not.

Our dictum in United States v. Luciano, 414 F.3d 174 (1st Cir. 2005), is in alignment with this framework. There, a teenager witnessed a man pointing a gun at a woman, flagged down a passing police cruiser, and reported what he had seen. Id. at 176. In dictum, we observed that the statement was an excited utterance,

made to secure immediate assistance for a woman in danger and, thus, was not testimonial.[5]  Id. at 180 n.3.

This discussion adumbrates the result in the case before us.  The anonymous caller stated that she had "just" heard gunshots and seen a man with a gun, that the man had pointed the gun at her, and that the man was still in her line of sight.  Her account strongly suggests that she and her son, as well as others in the vicinity, were in imminent personal peril when the call was made. The immediacy of the threat, the existence of a clear and present danger, and the fact that no substantial time had elapsed, in combination, severely erode any basis for a finding that the declarant was in a calm and reasoning state when she placed the 911 call.  And, furthermore, the precision of the declarant's physical description of the suspect is more consistent with a sense of urgency and a desire to obtain a prompt response — the removal of a dangerous man from the street — than with an anticipation that her call might be used prosecutorially.

These factors are sufficient to ground our decision. Based on the foregoing, we conclude that, here, the circumstances that made the anonymous 911 call an excited utterance were significant enough to overwhelm the caller's capacity to appreciate

---

[5]In Luciano, the government introduced the excited utterance at a sentencing hearing.  The court's characterization of it as nontestimonial was dictum because, as the court recognized, Crawford does not apply in sentencing proceedings.  See Luciano, 414 F.3d at 179.

the potential long-range use of her words. It follows that the call was nontestimonial and, therefore, properly admissible as an excited utterance. See Crawford, 541 U.S. at 68 (making clear that nontestimonial statements falling within firmly rooted hearsay exceptions remain admissible).

The appellant's fallback position is equally unavailing. It cannot fairly be said in the circumstances of this case that any part of the call was the product of structured police interrogation. Questions by a 911 operator that merely clarify or focus an excited caller's statement are not interrogation in any meaningful sense of the word. See, e.g., People v. Corella, 122 Cal. App. 4th 461, 469 (2004). Here, it would blink reality to place under the rubric of interrogation the single off-handed question asked by the dispatcher — a question that only momentarily interrupted an otherwise continuous stream of consciousness.

That ends this aspect of the matter. Because the admitted portion of the anonymous 911 call was both an excited utterance and nontestimonial in nature, the call's introduction into evidence did not sully the appellant's Sixth Amendment right to confrontation, notwithstanding the declarant's unavailability for cross-examination.

### B. The Prior Convictions.

The appellant also challenges the district court's admission of evidence of his three prior convictions. The

applicable rule provides that if a criminal defendant elects to testify, evidence that he has been convicted of a crime punishable by more than one year in prison "shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused." Fed. R. Evid. 609(a)(1). In general — there are exceptions, but none is relevant here — such evidence is only admissible if the convictions in question are less than ten years old. See Fed. R. Evid. 609(b).

By its terms, Rule 609(a) demands that the trial court construct a balance. We review a trial court's construction of this balance (i.e., its ruling admitting or excluding Rule 609 evidence) for abuse of discretion. See United States v. Powell, 50 F.3d 94, 102 (1st Cir. 1995).

The three prior convictions here at issue were all felony drug-trafficking convictions. Though somewhat remote in time from the date of the instant offenses — all three convictions occurred in 1994 — they were within the ten-year window framed by Rule 609(b). The question, then, is whether the district court abused its discretion in determining that the probative value of those convictions for impeachment purposes outweighed their prejudicial effects.

The appellant suggests that our decision in United States v. Tavares, 21 F.3d 1 (1st Cir. 1994) (en banc), bears on this question. In Tavares, we held that once a defendant who is facing

-21-

a felon-in-possession charge has stipulated to the fact of a preexisting felony conviction, the government may not introduce evidence as to the nature of that conviction for the purpose of establishing the "felon" element of the charge. Id. at 5. Even when the defendant has so stipulated, however, the government still may introduce evidence of prior felony convictions for impeachment purposes if the defendant elects to testify. See United States v. Tracy, 36 F.3d 187, 191-92 (1st Cir. 1994).

In this instance, the appellant stipulated that he previously had been found guilty of a felony. He subsequently chose to testify in his own defense. The government then sought to discredit that testimony by introducing the three prior convictions for impeachment purposes. Given this scenario, Tavares is of little utility.

We turn now to the disputed ruling. Although the appellant questions how past crimes that do not directly involve dishonesty or fraud are relevant to credibility, our case law long has recognized that Rule 609 represents a valid legislative judgment that such convictions do have some probative value for impeachment purposes. See United States v. Norton, 26 F.3d 240, 243 (1st Cir. 1994); United States v. Oakes, 565 F.2d 170, 172 (1st Cir. 1977). The nature of the underlying felony generally goes not to its admissibility per se but, rather, to its weight in the balancing of probative worth and prejudicial impact. See 4 Jack B.

Weinstein & Margaret A. Berger, Weinstein's Federal Evidence §
609.05[3][b] (2d ed. 2005) (collecting cases).

A wide array of factors may be considered when
calibrating the Rule 609 scales. Without limiting the generality
of that statement, these may include (i) the impeachment value of
the particular convictions; (ii) their immediacy or remoteness
(even though they are within the ten-year window); (iii) the degree
of potential prejudice that they portend; (iv) the importance of
the defendant's testimony; and (v) the salience of the credibility
issue in the circumstances of the particular case. See, e.g.,
United States v. Smith, 131 F.3d 685, 687 (7th Cir. 1997); United
States v. Jackson, 627 F.2d 1198, 1209 (D.C. Cir. 1980).

In this case, several of these factors cut in favor of
admissibility. Prior drug-trafficking crimes are generally viewed
as having some bearing on veracity. See, e.g., United States v.
Gant, 396 F.3d 906, 909-10 (7th Cir. 2005) (finding drug-
trafficking offense probative of credibility in gun possession
case); United States v. Lattner, 385 F.3d 947, 961 (6th Cir. 2004)
(similar). The offenses underlying the appellant's prior
convictions are not similar to the offenses charged in this case.
That is relevant because convictions for dissimilar crimes are
customarily thought to be less prejudicial than convictions for
similar crimes (which may run a risk of implying a propensity to
commit the crime). See, e.g., United States v. Montgomery, 390

F.3d 1013, 1016 (7th Cir. 2004); <u>Jackson</u>, 627 F.2d at 1210. Perhaps most important, this case hinged on a credibility choice; the jury had to decide whether to believe the appellant or the police officers. The salience of the credibility issue weighs in favor of admitting the prior convictions. <u>See</u> <u>United States</u> v. <u>Pritchard</u>, 973 F.2d 905, 909 (11th Cir. 1992); <u>Oakes</u>, 565 F.2d at 173.

To be sure, other factors (e.g., remoteness) weigh against admissibility. Taking the panoply of circumstances as a whole, however, the decision to accept or reject the proffer fell well within the encincture of the district court's discretion. Where the circumstances can fairly support a decision either to admit or to exclude particular evidence, it is not the proper province of an appellate court to second-guess the trial court's on-the-spot judgment. <u>Cf.</u> <u>Freeman</u> v. <u>Package Mach. Co.</u>, 865 F.2d 1331, 1340 (1st Cir. 1988) (observing, with respect to Rule 403 balancing, that "[o]nly rarely — and in extraordinarily compelling circumstances — will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect"). So it is here.[6]

---

[6]We note with approval that the trial court gave a limiting instruction indicating that the evidence of prior convictions was to be considered only insofar as that evidence bore on credibility. While the appellant criticizes this instruction on appeal, he interposed no contemporaneous objection to it.

The appellant makes two subsidiary arguments that warrant brief comment. First, he assigns error to the district court's failure to spell out its exposition of the Rule 609(a) balancing test. Although it would have been helpful for the court to make a detailed balancing analysis on the record, the court was not required to do so. See United States v. De La Cruz, 902 F.2d 121, 123 (1st Cir. 1990). Moreover, the absence of express findings is less troublesome where, as here, the record reflects the court's keen awareness of its duty to balance probative value against prejudicial effect and its discussion of the issue with counsel.

Second, the appellant, citing Powell, argues that the lower court erred in allowing the government to describe the nature of the prior felony convictions by using the title of each crime. In Powell, we observed that the practice of allowing the government to ask about the number of felonies, but not to describe their nature, was a "fair way" to help balance probative value against prejudicial impact. 56 F.3d at 102. Although Powell endorses the admission of Rule 609(a) evidence in this truncated manner, it in no way requires the use of such a technique. Here, moreover, the appellant's attempt to raise this argument stands on noticeably shaky ground: the district court expressly offered him the chance to have only the number of felonies recounted, but he eschewed the opportunity.

### C. **Sentencing**.

Finally, the appellant suggests that the district court erred in sentencing him pursuant to the mandatory sentencing guidelines then in effect. See United States v. Booker, 125 S. Ct. 738 (2005). He concedes that he did not preserve this claim of error below; thus, it engenders plain error review. See United States v. Martins, 413 F.3d 139, 153 (1st Cir. 2005); United States v. Antonakopoulos, 399 F.3d 68, 75 (1st Cir. 2005). In order to prevail under that standard, the appellant must make a four-fold showing: "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001).

With respect to a claim of Booker error, the first two elements of the plain error test are satisfied whenever a defendant has been sentenced pursuant to a mandatory guidelines system. Antonakopoulos, 399 F.3d at 77. That is the case here. The appellant stumbles, however, on the third step of the plain error staircase.

To demonstrate that a Booker error affected substantial rights, a defendant must show a "reasonable probability" that he would have received a more lenient sentence under an advisory guidelines regime. United States v. González-Mercado, 402 F.3d

-26-

294, 303 (1st Cir. 2005); <u>Antonakopoulos</u>, 399 F.3d at 78-79. In this type of situation, we are not "overly demanding as to proof of probability." <u>United States</u> v. <u>Heldeman</u>, 402 F.3d 220, 224 (1st Cir. 2005). Still, a defendant must offer something that has persuasive force. <u>See</u> <u>id.</u> (requiring, at a bare minimum, a "reasonable indication that the district judge might well have reached a different result under advisory guidelines").

The appellant argues that there is a reasonable probability of a more lenient sentence because the district court (i) sentenced him at the nadir of the applicable sentencing range and (ii) encountered severe limitations, under the then-mandatory guidelines, as to its ability to consider his personal characteristics and disadvantaged upbringing. These arguments lack force: the appellant's generic challenges simply cannot cross the <u>Antonakopoulos</u> threshold.

We need not tarry. We have held, with a regularity bordering on the monotonous, that a defendant cannot establish a reasonable probability of a more lenient sentence merely by showing that the district court sentenced him at the low end of the guideline sentencing range. <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Guzmán</u>, ___ F.3d ___, ___ (1st Cir. 2005) [No. 04-1888, slip op. at 12]; <u>United States</u> v. <u>Kornegay</u>, 410 F.3d 89, 99-100 (1st Cir. 2005). We also have held that when a sentencing court gives no indication that it is impressed by a defendant's disadvantageous upbringing,

fully detailed in the presentence investigation report, we cannot draw an inference from the court's silence that it would have imposed a more lenient sentence under an advisory guidelines system. See Martins, 413 F.3d at 154. On this record, then, the appellant has failed to carry his burden of showing a reasonable probability that he would have received a lower sentence under an advisory guidelines regime.

## III. CONCLUSION

We need go no further. This is a close and difficult case, but the appellant, though ably represented, has not convinced us that any reversible error inhered in either the admission of evidence or the imposition of sentence.

**Affirmed**.

**— Concurring opinion follows —**

**HOWARD**, **Circuit Judge**, **concurring in part and concurring in the judgment**. I agree that the statements by the anonymous 911 caller reporting Brito's offense were non-testimonial and therefore were admitted consistent with Crawford v. Washington, 541 U.S. 36 (2004). See ante at 17-20. More specifically, I agree that the statements here were properly admitted even if the nature of the inquiry is that, as the lead opinion says, "the testimonial hearsay inquiry focuses on whether a reasonable declarant, similarly situated, would have had the capacity to appreciate the legal ramifications of her statement." Ante at 17. I write separately, however, because I do not read Crawford to make the declarant's actual or hypothetically reasonable state of mind the loadstar by which we are to determine if a statement is testimonial. Compare id. at 17-18. Rather, as I read Crawford, the focus should be on the circumstances in which the statement was obtained, with the declarant's state of mind (at least in cases where that state of mind is shown to be no more than an awareness, rather than an intention) being only one factor in determining the nature of the circumstances. See Crawford, 541 U.S. at 68 (defining a testimonial statement by reference to the nature of the proceeding in which the statement was made).

In Crawford, the Supreme Court revised its approach to deciding when a hearsay statement may be admitted at a criminal trial without violating the Confrontation Clause's guarantee that

-29-

"the accused shall enjoy the right to be confronted with the witnesses against him." U.S. Const. Amend. VI.  Prior to Crawford, the Court permitted the admission of hearsay from an unavailable declarant so long as it "fell within a firmly rooted hearsay exception" or otherwise bore "particularized guarantees of the trustworthiness."  Ohio v. Roberts, 448 U.S. 56, 66 (1980). Crawford overruled Roberts as to so-called "testimonial" hearsay, holding that such hearsay is not to be admitted unless the declarant is unavailable for trial and the defendant had a prior opportunity to cross-examine.  See 541 U.S. at 63-68.  The Court did not, however, set forth a definitive definition of the term "testimonial."  See id. at 68.  Instead, it provided three "formulations" of "the core class of testimonial statements" at "various levels of abstraction":

> [1] ex parte in-court testimony or its equivalent -- that is material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially [;] [2] extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; [and] [3] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

Id. at 51-52.

As the lead opinion observes, these formulations have engendered a "miasma of uncertainty" among lower courts trying to identify testimonial hearsay. Ante at 2; see also Crawford, 541 U.S. at 68 n.10 (recognizing that the Court's failure to articulate a comprehensive definition of "testimonial" statements will cause "interim uncertainty"). Many courts have resolved this uncertainty by seizing on the most general formulation -- a statement is testimonial if the circumstance under which the statement was made would lead an objective witness reasonably to believe that the statement would be available for use at a later trial -- and applying it, without sufficient attention to Crawford's textual and historical rationale. See, e.g., United States v. Summers, 414 F.3d 1287, 1302 (10th Cir. 2005); United States v. Comer, 389 F.3d 662, 675 (6th Cir. 2004); United States v. Saget, 377 F.3d 223, 229 (2d Cir. 2004); Commonwealth v. Gonsalves, 445 Mass. 1, 12-13 (2005). Courts that have adopted this approach have divided on close questions such as the categorization of various 911 calls. Ante at 13-15. A sounder, more predictable body of law will emerge if, when applying the various "formulations," we hew closely to what I suggest is the foundational thrust of Crawford.

Crawford employed a historical approach to define the reach of the Confrontation Clause. See id. at 43-50. In reviewing the historical record, the Court identified "the civil-

law mode of criminal procedure" as "the principal evil at which the Confrontation Clause was directed." Id. at 50. In particular, the elimination of "ex parte examinations" was the Clause's main concern. Id.

The Court discussed typical examples of the abusive use of civil-law interrogations in early English law. Id. at 43-47. It emphasized the practice of justices of the peace examining suspects and witnesses before trial and then reading these examinations in court. Id. at 43. The Court highlighted the notorious 1603 trial of Sir Walter Raleigh, in which Raleigh was convicted of treason based on a hearsay statement given by Lord Cobham to the Privy Council. Id. at 44.[7] Dissatisfaction with these practices spawned the common law rule, in practice when the Sixth Amendment was adopted in 1791, that an out-of-court statement given to a government official as part of a formal interrogation could only be introduced if the defendant had previously been able to cross-examine the declarant. Id. at 46-47.

The historical examples in Crawford all involved the government's use of formal ex parte examinations to obtain hearsay statements that could later be used at a criminal trial.

---

[7]The Court also noted various controversial ex parte examinations conducted by English authorities in the Colonies, including the enforcement of the Stamp Act through the presentation of testimony taken by pretrial deposition or private judicial examination. Id. at 48.

According to the Court, this historical background demonstrates that the Confrontation Clause was intended to prohibit the government's use of these procedures where the defendant did not have an opportunity for cross-examination.  See id. at 68.

To support its historical interpretation, the Court examined the Confrontation Clause's text.  Id. at 51.  The Clause applies to "witnesses," which the Court defined as one "who bears testimony."  Id.  In turn, the Court defined testimony as "a solemn declaration or affirmation made for the purpose of establishing or proving a fact."  Id.  The Court then synthesized the Clause's text and history to reach the general conclusion that the Clause "reflects an especially acute concern with a specific-type of out-of-court statement" -- i.e., solemn declarations made to government officials in circumstances that resemble the repudiated civil-law mode of interrogation.  Id.

It is only after this discussion that the Court set forth its three formulations of testimonial hearsay.  Id. at 51-52.  The first two are examples of modern-day practices that resemble the civil-law mode of interrogation (i.e., affidavits, depositions, custodial examinations, prior testimony, confessions, and police interrogations).  Id.  Only the third presents a general definition without concrete examples.  Id.  In the historical and textual discussion preceding these formulations, I find no warrant to interpret this third formulation to

-33-

substantially broaden Crawford's holding. Instead, we should construe the three formulations as directed at the same concern: preventing the government from using hearsay statements at trial if the statements were obtained through a method that resembles a civil-law mode of interrogation.[8] See Gonsalves, 445 Mass. at 31-32 (Sosman, J., concurring) (stating that courts should strive to "harmonize all three [Crawford] formulations" instead of allowing the third to swallow the other two); see also United States v. Saner, 313 F. Supp. 2d 896, 901 (S.D. Ind. 2004) (stating that a statement is testimonial if it was made in circumstances similar "to the abuses at which the Confrontation Clause was directed); People v. Kilday, 20 Cal. Rptr. 3d 161, 173-74 (Cal. Ct. App. 2004) (holding that statement obtained by a police officer was non-testimonial because the officer was not acting in an investigative capacity when the statement was made). Under this view, the third formulation ordinarily should be limned by whether the statement was obtained by means of a procedure that resembles formal ex parte interrogation.

To be sure, applying the Crawford formulations in this manner will not easily resolve every close case. But this

---

[8]The Court described its three formulations as referring to a "core class of testimonial statements," all of which "share a common nucleus" that implicates the Confrontation Clause. Id. at 51. It would be inconsistent with the Court's description of these formulations, as defining a single core, to construe one formulation as incorporating situations different in kind from the other two.

approach keeps faith with the Supreme Court's expressed rationale for revising Confrontation Clause jurisprudence, and it will provide courts with a set of concrete examples to use as benchmarks in deciding Confrontation Clause cases. This approach therefore will promote more uniformity in decisions applying Crawford.

Under this approach, a statement obtained by recording a 911 call is non-testimonial in most cases. The purpose of the 911 operator is to provide citizens with an avenue to obtain emergency help from municipal or state personnel. Typically, the 911 operator focuses on ascertaining the location and identity of the caller and the nature of the emergency; she does not investigate or prosecute crimes.

In the Crawford examples, testimonial statements were obtained through proceedings that had a sufficient degree of formality to put the declarant on notice that her narrative would constitute "a solemn declaration or affirmation of a fact." Crawford, 541 U.S. at 51. By contrast, the expectation is that 911 calls occur in the midst of an emergencies. They lack the formal trappings and face-to-face contact associated with swearing out an affidavit, giving deposition testimony, testifying in court, confessing to the police, or participating in an interrogation by the police. Because the typical 911 call is distinct from the formal interrogation methods exemplified by the

<u>Crawford</u> examples, most statements obtained from 911 calls, including the one at issue here, are non-testimonial.