

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-18-00414-CR

John Bryan **FINCH**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 81st Judicial District Court, Atascosa County, Texas
Trial Court No. 16-07-0222-CRA
Honorable Stella Saxon, Judge Presiding

Opinion by:     Beth Watkins, Justice

Sitting:        Sandee Bryan Marion, Chief Justice
                Patricia O. Alvarez, Justice
                Beth Watkins, Justice

Delivered and Filed: January 15, 2020

AFFIRMED

John Bryan Finch was convicted by a jury of murder. On appeal, Finch contends the trial court erred in admitting a surveillance video of a fist fight and hearsay statements. Finch also contends the trial court erred in reading testimony to the jury in response to a note sent by the jury during deliberations. Finally, Finch contends the cumulative effect of all errors deprived him of a fair trial. We affirm the trial court's judgment.

BACKGROUND

On June 18, 2014, the body of Lindsey Wadkins was found on the side of a dirt road. She had been shot in the head, neck, and back.

Earlier that evening, Wadkins was at a trailer owned by Naomi Delgado and Brandon Penny. In addition to Wadkins, Delgado, and Penny, also present were Finch, Matthew Garcia a/k/a Turk,[1] Tommy Caldillo, and Samantha Jones. Turk and Penny, who were not charged with any crime relating to Wadkins's murder, testified at trial.

Viewing the testimony of Turk and Penny in the light most favorable to the jury's verdict, Wadkins, Finch, Delgado, and Jones were arguing about a fist fight in which Finch was involved earlier that evening with Adam Ochoa. Wadkins was present during the fist fight, is also seen on the video, and was instrumental in having a third person intervene to end the fight. During the subsequent argument at the trailer, Wadkins threatened to call the police on Finch or to "take him down." While Wadkins was either in the restroom or outside, Finch, Delgado, Jones, and Caldillo discussed beating her up and leaving her on the side of the road. At some point, Caldillo passed a handgun to Finch, and Finch, Delgado, Jones, and Caldillo talked about "tak[ing] [Wadkins] out" because she "might squeal or something." Wadkins, Finch, Delgado, and Jones then drove away together. When Finch, Delgado, and Jones returned without Wadkins, Finch told Turk he shot her. Sometime later, Delgado also told Penny that Finch shot Wadkins. Finally, Finch told Billy Martinez, a fellow inmate also referred to as BJ, that he shot Wadkins and provided details of the offense that were not reported to the public.

After hearing all of the evidence, the jury found Finch guilty of murder. Finch appeals.

---

[1] Because future quotes from the record refer to Garcia as Turk, we also will refer to him as Turk.

**SURVEILLANCE VIDEO**

In his first issue, Finch asserts the trial court erred in admitting a surveillance video showing a part of the fist fight between Finch and Ochoa which was the subject of the subsequent argument between Wadkins, Finch, Delgado, and Jones. In his brief, Finch contends the trial court erred in admitting the video because it should have been excluded under Rules 404(b) and 403 of the Texas Rules of Evidence. The State responds Finch did not object to the admissibility of the video under Rule 403; therefore, that complaint is not preserved for our review. The State also responds the video was properly admitted as evidence of motive and relationship under Rule 404(b).

Rule 404(b) provides that evidence of other crimes, wrongs, or acts "is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." TEX. R. EVID. 404(b). A trial court's ruling on the admissibility of evidence under Rule 404(b) is reviewed under an abuse of discretion standard. *Dabney v. State*, 492 S.W.3d 309, 318 (Tex. Crim. App. 2016). The trial court does not abuse its discretion unless its determination lies outside the zone of reasonable disagreement. *Id*.

Here, the evidence at trial established Wadkins threatened Finch during an argument over the fight depicted in the surveillance video. Immediately following the argument over the fight, Finch, Delgado, Jones, and Caldillo discussed a plan to "take [Wadkins] out," and Caldillo handed Finch a gun. Accordingly, the fight depicted in the surveillance video was evidence relevant to Finch's motive to murder Wadkins. Because the video was evidence of Finch's motive, the trial court did not abuse its discretion in overruling Finch's Rule 404(b) objection.

After a trial court rules on whether evidence is admissible under Rule 404(b), the trial court "has ruled on the full extent of the opponent's Rule 404(b) objection. The opponent must then make a further objection based on Rule 403, in order for the trial judge to weigh the probative and

prejudicial value of the evidence." *Santellan v. State*, 939 S.W.2d 155, 169 (Tex. Crim. App. 1997) (internal citation omitted); *see also Lopez v. State*, 200 S.W.3d 246, 251 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd); TEX. R. APP. P. 33.1(a). When the State sought to have the video admitted at trial, Finch only objected to its admissibility under Rule 404(b).[2] He therefore did not preserve a complaint that the trial court should have excluded the video under Rule 403 for our review.

Finch's first issue is overruled.

### HEARSAY STATEMENTS

During Penny's testimony, Finch objected to the admission of statements Delgado made to Penny following Wadkins's murder. On appeal, Finch contends the trial court erred in admitting the statements because they were inadmissible hearsay and their admission violated his Confrontation Clause rights. The State responds the trial court properly admitted the statements as excited utterances. The State further responds the statements were not testimonial and, therefore, not subject to Finch's Confrontation Clause rights.

A.     Standard of Review

We review a trial court's ruling on the admissibility of evidence under the excited utterance exception to the hearsay rule for an abuse of discretion. *Wall v. State*, 184 S.W.3d 730, 743 (Tex. Crim. App. 2006). We review whether a statement is testimonial or non-testimonial de novo. *Id*. at 742. "[T]he distinctive standards of review for hearsay objections and Confrontation Clause

---

[2] After the trial court watched the video outside the presence of the jury, the following exchange occurred:
THE COURT: Okay. And you're seeking to offer this for what purpose?
[PROSECUTOR]: Proof to show relationship between the parties prior to the homicide and motive, Your Honor.
THE COURT: And you're seeking to keep it out why?
[DEFENSE COUNSEL]: Your Honor, because I don't believe it shows motive, and I don't believe it has anything to do with the relationship between John Finch and Lindsey, at least this video doesn't.

objections to the admission of excited utterances arise because the hearsay exception depends largely upon the subjective state of mind of the declarant at the time of the statement, whereas the issue of whether an out-of-court statement (excited or otherwise) is 'testimonial' under *Crawford* depends upon the perceptions of an objectively reasonable declarant." *Id*. at 743

### B. Applicable Law

An excited utterance is "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." TEX. R. EVID. 803(2). "The basis for the excited utterance exception is a psychological one, namely, the fact that when a man is in the instant grip of violent emotion, excitement or pain, he ordinarily loses the capacity for *reflection* necessary to the fabrication of a falsehood and the 'truth will come out.'" *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003) (internal quotation marks omitted) (emphasis in original).

"In determining whether a hearsay statement is admissible as an excited utterance, the court may consider the time elapsed and whether the statement was in response to a question." *Id*. "However, it is not dispositive that the statement is an answer to a question or that it was separated by a period of time from the startling event; these are simply factors to consider in determining whether the statement is admissible under the excited utterance hearsay exception." *Id*. at 596. "The critical determination is whether the declarant was still dominated by the emotions, excitement, fear, or pain of the event or condition at the time of the statement." *Id*. (internal quotation marks omitted).

Under the Confrontation Clause, a "testimonial" statement is inadmissible at trial unless the declarant either takes the stand and is subject to cross-examination, or is unavailable and the defendant had a prior opportunity for cross-examination. *Burch v. State*, 401 S.W.3d 634, 636 (Tex. Crim. App. 2013). Testimonial statements are those "'made under circumstances which

would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" *Id*. (quoting *Crawford v. Washington*, 541 U.S. 36, 52 (2004)).

The Texas Court of Criminal Appeals has rejected any per se or categorical approach to excited utterance and testimonial hearsay inquiries. *Wall*, 184 S.W.3d at 742. As the court explained:

> [T]he excited utterance and testimonial hearsay inquiries are separate, but related. While both inquiries look to the surrounding circumstances to make determinations about the declarant's mindset at the time of the statement, their focal points are different. The excited utterance inquiry focuses on whether the declarant was under the stress of a startling event. The testimonial hearsay inquiry focuses on whether a reasonable declarant, similarly situated (that is, excited by the stress of a startling event), would have had the capacity to appreciate the legal ramifications of her statement.
>
> These parallel inquiries require an ad hoc, case-by-case approach. An inquiring court first should determine whether a particular hearsay statement qualifies as an excited utterance. If not, the inquiry ends. If, however, the statement so qualifies, the court then must look to the attendant circumstances and assess the likelihood that a reasonable person would have either retained or regained the capacity to make a testimonial statement at the time of the utterance.

*Id*. at 742 (quoting *United States v. Brito*, 427 F.3d 53, 61–62 (1st Cir. 2005)).

C.      Analysis

At trial, Penny testified Delgado was "freaking out" upon returning without Wadkins, and Delgado said Wadkins was dead. No objection was made to Penny's testimony about this statement by Delgado. Penny then testified he made everyone leave and tried to talk to Delgado about what happened, but she was still "freaked out." After everyone left, Delgado burned her shoes and buried them because Jones called to tell her shoe marks would be at the crime scene. Penny and Delgado then each took a shower and went to bed. After they were in bed, Penny testified he again tried to talk to Delgado about what happened. He described Delgado as "real skittish" and "incoherent, like, you know, you talk to somebody, they can't answer you right away, real out there, kind of." Penny testified this was not Delgado's normal behavior, and she was still

upset. When the prosecutor asked Penny what Delgado told him, defense counsel objected on the basis of hearsay, asserting the prosecutor had not established the excited utterance exception. After the trial court overruled the objection, Penny testified Finch shot Wadkins three times and, after Jones expressed concern about whether she was dead, Finch shot her four more times. On cross-examination, Penny testified Delgado was "scared and stirred up" while they were talking in bed.

In arguing Delgado's statements to Finch were not excited utterances, Finch points to Penny's testimony that an hour had elapsed from the time Delgado returned home and when she told Penny that Finch shot Wadkins. Finch also points to the testimony that Delgado had burned and buried her shoes and taken a shower in that time period. The Texas Court of Criminal Appeals held in *Zuliani*, however, that the period of time from the startling event to the declarant's statements is not dispositive. 97 S.W.3d at 596. The court also held the declarant's statements were admissible as excited utterances in that case despite the fact that twenty hours had elapsed between the event and the statements. *Id*.; *see also Ricketts v. State*, 89 S.W.3d 312, 320 (Tex. App.—Fort Worth 2002, pet. ref'd) (holding declarant's statement to fiancé upon arriving home that defendant shot the victim was admissible as an excited utterance even though shooting occurred two hours earlier where fiancé testified declarant "got . . . excited" when she asked him what happened). As previously noted, the question is whether the trial court was within the zone of reasonable disagreement in determining Delgado was still dominated by the emotions of the event. *Zuliani*, 97 S.W.3d at 596. Based on Penny's testimony, we hold the trial court was within the zone of reasonable disagreement and did not abuse its discretion in ruling Delgado's statement was admissible as an excited utterance.

Focusing on whether a reasonable declarant under the circumstances facing Delgado would believe her statements would be used at a subsequent murder trial, we agree with the State that Delgado did not comprehend the legal significance of her words. An objective witness telling her

then-husband what happened for the first time would not reasonably believe the statement would be available for use at a later trial. *Burch*, 401 S.W.3d at 636. Accordingly, we hold the trial court did not violate Finch's Confrontation Clause rights in admitting the statements.

Finch's second issue is overruled.

## RESPONSE TO JURY QUESTIONS

In his third issue, Finch contends the trial court erred in allowing testimony to be read to the jury during deliberations. Finch argues the trial court did not make a sufficient inquiry into the jury's dispute to "identify the specific witness or portion which [the jury] found to be in conflict." Finch also argues the portions of testimony the trial court allowed to be read bolstered the State's case by focusing the jury "only on the of the [sic] portions of testimony which were damaging to John Finch, and completely ignored the portions elicited through cross-examination which discredited the subject testimony excerpts." The State responds the trial court identified the specific portions of testimony over which the jury had a dispute, and Finch did not preserve his complaint regarding the failure to read responsive cross-examination for our review.

A.      Jury Questions and Responses

In his brief, Finch only complains about the trial court's ruling on his objection regarding the response to Juror Note No. 5. However, that question and the trial court's response must be read in the context of the jury's prior questions requesting testimony, and the trial court's responses to those questions.

Juror Note No. 1 stated:

Turk[']s – Testimony
BJ's Testimony
Date of Finch's arrest
Date of [sic] Police received gun as evidence

The trial court sent the following response to the jury without objection:

- 8 -

Members of the jury, the jury may have testimony about a disputed point in a witness' testimony read back to them. Please state exactly what your disagreement as to the testimony is, and the court reporter will search her notes and read that particular testimony back to you.

Juror Note No. 2 stated:

Turk[']s testimony of Finch being threatened by Lindsy [sic] to call cops on Him.

The trial judge noted the jury "didn't say it was a point in dispute," but the trial judge was "going to assume it is since I told [them]." Testimony was then read to the jury. Finch does not challenge the trial court's overruling of his objection to Juror Note No. 2 in his brief.

Juror Note No. 3 requested:

Can we have Turk[']s and BJ's complete testimony to compare them to each other.

The trial court sent the following response without objection:

Members of the jury, you may have read back the testimony about a particular point in dispute and no other. Please certify that you disagree as to certain specific testimony, and I will order the court reporter to search her notes to find the testimony to be read back to you.

Juror Note No. 4 requested permission for the jurors to take a break. In response, the trial court gave the jury a fifteen-minute break.

Juror Note No. 5 requested:[3]

We want to hear Turk[']s testimony on what was said when John, Naomi and Sam returned home after the incident without Lydsey [sic].

Want to hear BJ testimony about Finch shooting Lyndsy [sic].

Want to [hear] BJ's testimony that Finch told him about disposing of the body after she was shot.

---

[3] The record does not show how much time elapsed between the jury returning from its break and its sending of Juror Note No. 5.

Defense counsel objected that the jury was essentially asking for all the testimony to be read back and that the jury did not say they had a conflict. The trial judge proposed to respond with the following:

Ladies and Gentlemen[,] Are you in conflict as to this testimony?

Defense counsel did not object to the trial judge's proposed response. Instead, defense counsel stated he did not "mind asking them whether they have a conflict in the testimony, but they need to tell us what their conflict is." Defense counsel further argued, "There needs to be some specificity as to what they're asking us for." The trial judge responded:

The Court is of the opinion that this will identify whether or not there is a conflict. The Court has already instructed that I cannot have testimony read back unless there is a conflict, and I think that the jury has just failed to note that for the Court. But this will make it abundantly clear, depending on what their answer is.

The jury answered the question "yes." The trial judge then instructed the court reporter to search her notes.

After a brief recess, defense counsel argued the jury's request regarding Turk's testimony was vague and "didn't say what the dispute was about." Defense counsel further argued the jury should just be told to deliberate, asserting:

They're going to come back time and time again with more questions because we keep giving them those answers when all they have to say is we have a dispute about so and so's testimony and they get it read back.

The trial judge responded:

The Court finds that the testimony the court reporter has read back is responsive to the question — to the request by the jury for testimony of Turk on what was said when John, Naomi, and Sam returned home after the incident. And the jurors have certified they're in conflict about that testimony.

The court reporter then located the testimony responsive to the request for "BJ testimony about Finch shooting Lindsey." Defense counsel again objected asserting the jury was "not asking anything specific" and the proper instruction was for them to continue to deliberate. Defense

- 10 -

counsel made the "same objection" to the proposed testimony to be read regarding "BJ's testimony that Finch told him about disposing of the body after she was shot." The trial court overruled the objections, and the following testimony was read to the jury:

THE COURT: Be seated, please.
Ladies and gentlemen of the jury, the court reporter has located the testimony about which you indicated you were in dispute, and she will now read to you the testimony that she found. The first testimony is testimony of Matthew Garcia [Turk].

(Requested portion read back
by the court reporter.)

Q. "Okay. And so you stayed there, and at some point I guess someone comes back.
A. Uh-huh.
Q. Who comes back?
A. Sam, Naomi, and Finch.
Q. Okay. Lindsey never came back?
A. No.
Q. So do they come in the house, or what happens?
A. Yes. They came inside.
Q. Okay. So all three came inside?
A. Yes.
Q. And when they come back inside, what are they saying?
A. Naomi had -- was cussing and saying, like, "I hit that girl one time in the mouth and she fell."
Q. How are they acting at that point? What's their mood?
A. Shocked. Like shocked.
Q. Okay. Who's shocked?
A. Actually all three of them.
Q. Okay. So how do you describe that? How did you know they were shocked? How are they acting?
A. You could tell by their eyes, the way Naomi was moving, the way Sam was moving.
Q. Okay. What was Sam doing?
A. Saying, "I got to go home. I got to go home."
Q. Okay. How was she acting?
A. Like nervous.
Q. And how about Naomi? How was she acting?
A. She didn't seem nervous. She was just hyper and jittery.
Q. Okay. And how about the defendant, John Finch? How was he acting?
A. Like normal.
Q. Okay. And what did he say when they came back in?
A. That he shot her three times and then four more times.

Q.  He told y'all that?
A.  Yes, ma'am."

THE COURT:  The reporter will now read to you the requested testimony of Billy Martinez [BJ].

(Requested portion read back
by the court reporter.)

A.  "And I remember trying to think, you know, if I had seen it.  Because I was [sic] watch the news a lot.  But now — And I didn't remember.  And then he just — He said he took — He even said he [sic] her name.  He said he took her down the road with two girls, and he said they got out — he told her to get out of the car and took her to the back.  And then he said he pushed her down and he pulled out a gun.  He said he shot her four times and then she looked up at him and said, "Oh, my God," and he said he shot her — he said he got back in the car.  As they started to drive away, he told them to stop, that he didn't want the family to have an open casket, and so he got out, when he shot her in the head.  He didn't say how many times, but he said he shot her.  And, you know, I can go into detail because I remember, but —"

THE COURT: And there was additional testimony on that issue.

(Requested portion read back
by the court reporter.)

THE REPORTER:      This is the question.

Q.  "So he said he got out, took her to the back, and what did he do next after he took her to the back?
A.  He said he pushed her down and he pulled his gun out.  She seen the barrel of the gun.  She said, "Oh, my God," and he said he shot her.
Q.  Did he say what he did next?
A.  He said he got back in the car and they started to drive off.  And he said, "I don't want her family to have a fucking closed casket.  Stop."  And he got out and he said he went and shot her in the head."

THE COURT:  And then the last issue that you had for the reporter to search has been found in Mr. Martinez's testimony.

(Requested portion read back
by the court reporter.)

Q.  "Did he say where did they go after that?
A.  Oh, yeah.  He did said [sic] say that they wanted to go get a carpet or something to roll her up in and — you know, so they could get rid of the body.
Q.  And did they do that and try to come back?

- 12 -

A. They tried to.

Q. And what happened?

A. But he said when they came back, the cops were there and stuff, lights, so they just kept on going."

THE COURT: That completes the readback of the testimony. Please continue your deliberations in the jury room. We will be in recess.

B.      Applicable Law and Standard of Review

Article 36.28 of the Texas Code of Criminal Procedure provides:

> In the trial of a criminal case in a court of record, if the jury disagree as to the statement of any witness they may, upon applying to the court, have read to them from the court reporter's notes that part of such witness testimony or the particular point in dispute, and no other . . . .

TEX. CODE CRIM. PRO. ANN. art. 36.28. "When the jury asks the trial court to read back certain disputed testimony, the trial court judge must first determine if the jury's inquiry is proper under Article 36.28." *Thomas v. State*, 505 S.W.3d 916, 923 (Tex. Crim. App. 2016). "If it is proper, the trial court must then interpret the communication and decide what sections of the testimony will best answer the inquiry." *Id*. "The trial court has discretion to decide what sections of the testimony will best answer the query, and limit the testimony accordingly." *Id.* (internal quotation marks omitted). "However, if a trial court reads too much or too little testimony to the jury, such a response may serve to bolster the State's case unnecessarily." *Id*. "An appellate court should not disturb a trial court judge's decision under Article 36.28 unless a clear abuse of discretion and harm are shown." *Id*.

"Complaints about error in the reading of trial testimony must be preserved by objection at the time of the reading." *Id*. at 924. "To preserve error, a party must object and state the grounds for the objection with enough specificity to make the trial judge aware of the complaint, unless the specific grounds were apparent from the context." *Id*. "The objection must be sufficiently clear to give the judge and opposing counsel an opportunity to address and, if necessary, correct the

purported error." *Id*. "If a trial objection does not comport with arguments on appeal, error has not been preserved." *Id*.

C.    Analysis

First, the record does not reflect Finch made any objection to the trial court's failure to include portions of the testimony elicited through cross-examination. Accordingly, this complaint is not preserved for our review. *Id*.

With regard to whether the jury disagreed regarding the testimony requested in Juror Note No. 5, the trial court sent numerous instructions to the jury in response to prior notes informing the jurors they needed to disagree as to the testimony of the witness before any testimony could be read back. In response to those instructions and in response to an additional question regarding whether they were in dispute over the testimony requested in Juror Note No. 5, the jury responded they were in dispute. Article 36.28 requires only that the jury disagree about a witness's testimony. It does not require the jury to state the nature of their disagreement in a particular manner. *Howell v. State*, 175 S.W.3d 786, 793 (Tex. Crim. App. 2005) ("The statute requires that the jury disagree; it does not require that the jury use any particular words to express that disagreement."). Accordingly, we cannot hold the trial court abused its discretion in determining the jurors disagreed as to the testimony they were requesting. *See Thomas v. State*, 505 S.W.3d at 923.

With regard to the trial court's interpretation of the jury's notes and its selection of the testimony that best answered the jury's inquiry, we again hold the trial court did not abuse its discretion. *See id.* From our review of the record, the trial court selected the sections of testimony that were directly responsive to the discrete facts about which the jury was in dispute.

Finch's third issue is overruled.

## CUMULATIVE ERROR

In his fourth issue, Finch alludes to other error occurring at trial; however, he fails to provide argument and authority regarding those errors.[4]   TEX. R. APP. P. 38.1(i) (requiring an appellant's brief to "contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record").   Therefore, he has waived any complaints about those errors.   *See Lucio v. State*, 351 S.W.3d 878, 896–97 (Tex. Crim. App. 2011) (holding that point of error inadequately briefed presented nothing for review).   And, we have overruled the issues Finch adequately briefed.   Accordingly, Finch's fourth issue is overruled.

## CONCLUSION

The trial court's judgment is affirmed.

Beth Watkins, Justice

DO NOT PUBLISH

---

[4] Finch does provide citations to authorities to support the following assertion, "In closing the State also improperly argued that acquitting John Finch would allow him to 'walk[] down the stairs with you and become[] a member of this community again." We hold, however, that this one sentence is not an adequate argument to challenge the State's closing argument.