# United States Court of Appeals
## For the First Circuit

No. 06-1727

UNITED STATES OF AMERICA,

Appellee,

v.

CLARENCE L. EARLE,
a/k/a ERIC ALLEN, a/k/a THEODORE WILSON,
a/k/a LEMONT TIPPET, a/k/a ROBERT PREVAL,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark L. Wolf, U.S. District Judge]

Before

Lynch, Circuit Judge,
Stahl, Senior Circuit Judge,
and Howard, Circuit Judge.

Charles W. Rankin, with whom Jonathan Harwell and Rankin & Sultan were on brief, for appellant.
Seth P. Berman, Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, was on brief, for appellee.

June 6, 2007

**LYNCH**, **Circuit Judge**. In November 2005, a jury convicted Clarence L. Earle on one count of illegal reentry of a deported alien, in violation of 8 U.S.C. § 1326. The district court sentenced Earle to 78 months of imprisonment, 36 months of supervised release, and a $100 special assessment.

On appeal, Earle argues there were two trial errors: (1) that his right to confrontation under the Sixth Amendment, as defined in Crawford v. Washington, 541 U.S. 36 (2004), was violated by the admission at trial of a Certificate of Nonexistence of a Record (CNR), and (2) that the district court erred in refusing to instruct the jury that it must find that his prior deportation was lawful beyond a reasonable doubt. The CNR was issued by the Bureau of Citizenship and Immigration Services (CIS), within the Department of Homeland Security (DHS), and it certified that a search of the agency's files demonstrated that there was no record that Earle had obtained consent from the Attorney General or the Secretary of DHS to reapply for admission into the country after having been deported.

Earle also argues there were two sentencing errors: (1) that the district court erred in imposing a 16-level enhancement under the Sentencing Guidelines for a prior deportation after conviction of a "crime of violence," and (2) that his sentence was in excess of the applicable statutory maximum because the fact that

he had previously been convicted of an aggravated felony was not found by the jury beyond a reasonable doubt.

We affirm Earle's conviction and his sentence.

## I.  <u>Facts</u>

The defendant, a citizen of Jamaica, was arrested and detained by the Boston Police Department on November 6, 2003.  The defendant was present in the United States despite having been deported twice.  On February 12, 2004, he was transferred into federal custody.  The following day, he was fingerprinted.

The defendant's first deportation from the United States occurred on January 3, 1991.  He was then using the name Clarence Earle, although he has used a number of different names over time.  As a regular part of the deportation process, Earle's fingerprint was placed on the 1991 Warrant of Deportation.

Before his first deportation, Earle signed an affidavit stating that he had arrived in the United States sometime in 1986 on a passenger ship, and that he had entered the country illegally without ever having been "issued any documents from the United States Immigration Service."  Earle was fingerprinted on the same day that he signed this affidavit.

The defendant attempted to reenter the United States from Canada on September 24, 1992.  He presented a Massachusetts identification card bearing the name Lemont Tippet.  Fingerprints

taken from "Tippet" by the Immigration and Naturalization Service[1] matched those taken from the defendant in February 2004. The defendant was again deported on July 10, 2002, under the name Clarence Earle. Earle's fingerprint was placed on the 2002 Warrant of Deportation.

This case concerns Earle's presence in the United States following the 2002 deportation and the resulting charges against him under 8 U.S.C. § 1326. Section 1326 criminalizes the reentry of any alien who has been deported from the United States unless "prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission."

At trial, the government produced a fingerprint expert who testified that the fingerprints taken from Earle in February 2004 matched those on the 1991 and 2002 Warrants of Deportation, as well as other documents which were found in the defendant's Alien File, or "A-file," at the INS.[2]

---

[1] On March 1, 2003, the functions of the Immigration and Naturalization Service were transferred to the Department of Homeland Security. Homeland Security Act of 2002, Pub.L. No. 107-296, § 471(a), 116 Stat. 2135, 2205 (codified at 6 U.S.C. § 291(a)). We use the term "INS."

[2] An A-file is kept by the INS and its successor agencies on foreign nationals who come in contact with the government. It contains a wide range of documents, including applications for benefits, pictures, birth certificates, marriage certificates, internal memos, records of enforcement actions and deportations,

The government also presented two types of evidence showing that Earle had never applied for or received permission from the Attorney General to reenter the United States: in-person testimony and the CNR. Joanne Sassone, a Records Information Services Officer for CIS in Boston, testified that she was responsible for overseeing CIS employees who maintained A-files and updated corresponding computer databases. She explained that an alien who has been deported must file a Form I-212 in order to apply for reentry to the United States. Such an application, if it were made, would appear in the alien's A-file. A record of the filing fee and the final communication regarding the I-212 application would also be entered in various computer indices. Sassone testified that she personally had reviewed Earle's entire A-file and the computer indices, and that there was no document or record that Earle had ever filed a Form I-212. Nor was there any document or record that Earle had ever received permission to reenter the United States.

On cross-examination, Sassone stated that it was possible for an alien to have more than one A-file (for example, when the alien uses different names), and that multiple files would be consolidated if such a discovery were made. Earle's file had undergone such consolidation. Sassone also confirmed that four pages that pertained to another person had been misfiled in Earle's

and fingerprint cards.

A-file. Those documents belonged to a different individual who had a deportation action taken against him at a similar time as Earle. When Sassone discovered that several pages had been misfiled in Earle's file, she obtained the A-file of the other individual and searched for any documents concerning Earle. There were none.

Defense counsel also asked Sassone about employee staffing at the five document service centers maintained by CIS.[3] Sassone testified that some employees worked for private contractors, rather than for the government. She also confirmed that, several years earlier, employees at a district office in Los Angeles had improperly shredded thousands of immigration-related documents. She was not aware of any similar events at the Vermont service center, which covers the New England area.

On redirect, Sassone testified that even if an alien's I-212 application were somehow misfiled or destroyed, there would still be evidence in the computer indices or in the A-file of the application having been submitted. She reiterated that she had searched the relevant computer indices and had found no notation that Earle had filed an I-212 application.

The government also introduced into evidence, over defense counsel's objection, a CNR signed by Ruth E. Jones, the

---

[3] CIS document service centers are located in Vermont, Nebraska, Missouri, Texas, and California.

Chief of the Record Services Branch, Office of Records, CIS. The document stated that

> after a diligent search relating to . . . Clarence Lynval Earle, . . . no evidence is found to exist in the records that the defendant obtained consent before March 1, 2003 from the Attorney General . . . to reapply for admission in the United States; and no evidence is found to exist in the records that the defendant obtained corresponding consent after February 28, 2003 from the Secretary of [DHS].

The district court ruled that the evidence was admissible under Federal Rule of Evidence 803(10). Jones did not testify at Earle's trial.

Sassone testified that she did not have personal knowledge of who prepared the CNR for Earle's case. She did describe her understanding of the practice of preparing a CNR. She testified that "[a]ll the A files must be reviewed and all applicable computer indices must also be reviewed and searched before [a CNR] can be prepared." She also stated that Jones, a senior official at CIS, would not have personally reviewed Earle's A-file or searched the computer indices. Sassone stated that whoever performed these tasks to prepare the CNR would have undertaken the same searches that Sassone herself had carried out when she had independently concluded that Earle had not applied for or received permission to reenter the United States.

The defense in this case was that the government had not met its burden of proof beyond a reasonable doubt that Earle had

not obtained the permission of the Attorney General to reapply for admission into the country.  In its closing, the defense conceded that "there really is no dispute that Mr. Earle is an alien . . . [or] that Mr. Earle was previously deported . . . [or] that in February 2004, Mr. Earle was found in the United States."  Defense counsel stressed that Jones was not made available to testify to the accuracy of the CNR; that the government had not provided any printouts from its searches of the relevant computer indices; and that there were uncertainties raised by the history of filing and retention problems at CIS's document service centers.

The jury returned a guilty verdict.  At sentencing, the district court imposed a 16-level enhancement under U.S.S.G. § 2L1.2 for a prior deportation after conviction of a crime of violence -- namely, assault and battery with a dangerous weapon. The district court sentenced Earle to 78 months, at the upper limit of the applicable Guidelines range.  Earle will likely be deported after serving his sentence.

## II.  Asserted Trial Errors

## A.  Confrontation Clause Challenge

Before Crawford effected a change in the law concerning Confrontation Clause challenges, this court in United States v. Ventura-Meléndez, 275 F.3d 9 (1st Cir. 2001), rejected a Confrontation Clause challenge to the admission of a CNR.  Id. at 15-16 (concluding that CNR demonstrated "particularized guarantees

of trustworthiness" (quoting Ohio v. Roberts, 448 U.S. 56, 66 (1980)) (internal quotation marks omitted)). Earle's appeal asks us to reconsider this issue in light of the Supreme Court's new framework for Confrontation Clause challenges, as articulated in Crawford.

This question about the Confrontation Clause and CNRs arises because Congress has put the burden on the government to prove a negative -- that the Attorney General did not grant permission to reapply for admission. Lay people might logically think the statute would place the burden on the defendant to prove he had received consent to reapply.[4]

When the government offered the CNR into evidence at trial, defense counsel objected, arguing that admission of the CNR without an opportunity to cross-examine the person who prepared the document would violate Earle's right to confrontation. The district court overruled the objection, holding that the CNR was not "testimonial" within the meaning of Crawford. In reaching this conclusion, the district court adopted the reasoning of United

---

[4] Congress has placed some burdens on the alien. Subsection 1326(d) provides limited circumstances under which an alien may collaterally attack a previous deportation order. The alien must show (1) that he exhausted any available administrative remedies, (2) that the deportation proceedings improperly deprived him of the opportunity for judicial review, and (3) that the entry of the deportation order was fundamentally unfair. 8 U.S.C. § 1326(d); see also United States v. DeLeon, 444 F.3d 41, 44-45 (1st Cir. 2006). Earle does not argue that he meets the standards of subsection 1326(d).

States v. Cervantes-Flores, 421 F.3d 825 (9th Cir. 2005), and United States v. Rueda-Rivera, 396 F.3d 678 (5th Cir. 2005). The district court ruled that the CNR was admissible under Federal Rule of Evidence 803(10).[5]

We review the district court's legal conclusions regarding the Confrontation Clause de novo. United States v. Rondeau, 430 F.3d 44, 47 (1st Cir. 2005); United States v. Brito, 427 F.3d 53, 59 (1st Cir. 2005). If a constitutional error has occurred, we must order a new trial unless the government has shown that any error was "harmless" beyond a reasonable doubt. See Olden v. Kentucky, 488 U.S. 227, 232 (1988); United States v. Pacheco, 434 F.3d 106, 116 (1st Cir. 2006); United States v. Coker, 433 F.3d 39, 47 (1st Cir. 2005).

---

[5] Rule 803 provides:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
> . . .
> (10) Absence of public record or entry. To prove the absence of a record, report, statement, or data compilation, in any form, or the nonoccurrence or nonexistence of a matter of which a record, report, statement, or data compilation, in any form, was regularly made and preserved by a public office or agency, evidence in the form of a certification in accordance with rule 902, or testimony, that diligent search failed to disclose the record, report, statement, or data compilation, or entry.

The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. In Crawford, the Supreme Court abrogated the rule of Ohio v. Roberts that admission of hearsay does not run afoul of the Confrontation Clause "if the declarant [is] unavailable and the statement [falls] under a 'firmly rooted hearsay exception' or otherwise [bears] particularized guarantees of trustworthiness." Horton v. Allen, 370 F.3d 75, 83 (1st Cir. 2004) (quoting Roberts, 448 U.S. at 66). Instead, Crawford held that the Confrontation Clause bars admission of testimonial hearsay in a criminal case unless the declarant is unavailable and the accused has had a prior opportunity for cross-examination. 541 U.S. at 68. More recently, in Davis v. Washington, 126 S. Ct. 2266 (2006), the Court held that the Confrontation Clause applies only to testimonial hearsay. Id. at 2274.

Crawford analysis generally requires a court to consider two threshold issues: (1) whether the out-of-court statement was hearsay, and (2) whether the out-of-court statement was testimonial. See Crawford, 541 U.S. at 68; United States v. Maher, 454 F.3d 13, 20 (1st Cir. 2006).

As to the first issue, it is undisputed that the CNR constituted hearsay. The CNR contained statements made by a declarant not present at trial, and those statements were offered

-11-

into evidence to prove the truth of the matter asserted -- that, after a diligent search of Earle's A-file, no evidence was found that the defendant had obtained consent to reapply for admission to the United States.  See Fed. R. Evid. 801(c) (defining hearsay).

Earle's Confrontation Clause argument hinges on the second issue -- whether or not the CNR is "testimonial."  The Supreme Court expressly declined in Crawford to provide "a comprehensive definition of 'testimonial.'"  541 U.S. at 68.  The Court followed a similar approach in Davis, resolving the two cases before it "[w]ithout attempting to produce an exhaustive classification of all conceivable statements . . . as either testimonial or nontestimonial."  126 S. Ct. at 2273.  The Court did, however, list in Crawford three illustrative formulations of the "core class of 'testimonial' statements," 541 U.S. at 51: (1) "ex parte in-court testimony or its functional equivalent -- that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially," id.; (2) "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," id. at 51-52 (omission in original) (quoting White v. Illinois, 502 U.S. 346, 365 (1992)) (internal quotation marks omitted); and (3) "statements that were made under circumstances which would lead an

-12-

objective witness reasonably to believe that the statement would be available for use at a later trial," id. at 52.

This court, applying Crawford to determine whether a statement is testimonial, has asked whether "an objectively reasonable person in [the declarant's] shoes would understand that the statement would be used in prosecuting [the defendant] at trial." Maher, 454 F.3d at 21; see also Brito, 427 F.3d at 60. Other courts of appeals have adopted similar tests. See United States v. Gilbertson, 435 F.3d 790, 795-96 (7th Cir. 2006); United States v. Hinton, 423 F.3d 355, 359-60 (3d Cir. 2005); United States v. Cromer, 389 F.3d 662, 673-74 (6th Cir. 2004); United States v. Saget, 377 F.3d 223, 228-29 (2d Cir. 2004). In Davis, the Supreme Court also asked whether the particular circumstances surrounding each police interrogation objectively indicated a primary purpose that was testimonial. 126 S. Ct. at 2277.

Earle presents a serious argument that the CNR admitted at his trial was testimonial. His lead argument is that the CNR qualifies as testimonial under all three of the formulations provided in Crawford, as well as under this court's approach in Maher and Brito. He argues the CNR is a formal document which was in fact prepared in order to be used at trial. See Crawford, 541 U.S. at 51-52. Earle also argues that the CNR qualifies as testimonial under the test previously applied in this circuit: an objectively reasonable person asked to search Earle's A-file and

-13-

prepare a CNR would understand that the document would be used for prosecutorial purposes.  See Maher, 454 F.3d at 21; Brito, 427 F.3d at 60.

The government concedes here that "the CNR at issue in this case . . . was only created in anticipation of litigation."[6] The government argues that, nonetheless, the reasonableness of an expectation of prosecutorial use "do[es] not transform an otherwise non-testimonial business record, made in the normal course of business, into testimonial evidence"; it cites decisions from other circuits for support.  See United States v. Urquhart, 469 F.3d 745, 748-49 (8th Cir. 2006) (rejecting Confrontation Clause challenge to admission of CNR); Cervantes-Flores, 421 F.3d at 830-34 (same); Rueda-Rivera, 396 F.3d at 680 (same).[7]

The thrust of these cases is that CNRs are not barred by the Confrontation Clause because they closely resemble business records, and business records, under Crawford, constitute a common

---

[6] In response to a question from the court, the government filed a letter pointing out that CNRs may be made for purposes other than litigation.  For example, if an alien wishes to prove that he has not applied for United States citizenship (perhaps for purposes of retaining citizenship in another country), the agency would investigate and, if appropriate, issue a CNR certifying that no such application exists.  The government's letter also stated that "the agency does not routinely create CNRs documenting" the "non-existence of an alien's application for permission to return to the United States."

[7] The Fourth Circuit, in an unpublished opinion, has also taken a position similar to that taken by the Fifth, Eighth, and Ninth Circuits.  United States v. Mendoza-Orellana, 133 F. App'x 68, 69-70 (4th Cir. 2005) (per curiam) (unpublished).

-14-

law exception to the right of confrontation. 541 U.S. at 56 ("Most of the [common law] hearsay exceptions covered statements that by their nature were not testimonial -- for example, business records or statements in furtherance of a conspiracy." (emphasis added)); id. at 54 (commenting that the Sixth Amendment is "most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding"); see also id. at 76 (Rehnquist, C.J., concurring in judgment) (characterizing the Court's analysis of "testimony" as "exclud[ing] at least some hearsay exceptions, such as business records and official records" (emphasis added)).

The government points out that certificates of authenticity were admissible at common law, even when created with an eye toward litigation.[8] The government argues that a CNR, by analogy to a certificate of authenticity, should be treated like a business record.[9] The government makes a functional argument.

---

[8] The Advisory Committee Note to Federal Rule of Evidence 902(4) states: "The common law and innumerable statutes have recognized the procedure of authenticating copies of public records by certificate. The certificate qualifies as a public document, receivable as authentic when in conformity with [various authentication requirements]." See also 5 J. Wigmore, Evidence § 1674(1)-(2), at 824 (Chadbourn rev. 1974) [hereinafter 5 Wigmore] (noting that typically at common law there was no hearsay exception for certificates of authenticity if the office holder did not have express authority to make such a certificate, but that certificates pertaining to "facts covered by the terms of [an office holder's express] authority" were admissible (emphasis omitted)).

[9] The government characterizes the common law hearsay exception for certificates of authenticity as being part of the

-15-

Both certificates of authenticity and CNRs, the government says, merely reflect the state of a set of routinely kept business records existing prior to litigation.[10]  See Cervantes-Flores, 421 F.3d at 833.  As the government points out, an official would have to perform the same kinds of searches whether he was asked to prepare a certificate of authenticity or a CNR.  See id. at 832 ("In either case, someone would have . . . to search the INS database to verify the document's existence or nonexistence.").  Moreover, both federal and state officials commonly perform searches of public documents in preparation for criminal trials in order to prepare CNRs, and the effect of requiring testimony instead of CNRs would be very burdensome.

Earle points out a difference between certificates of authenticity and CNRs: a certificate of authenticity merely establishes the validity of a second document that contains probative evidence, whereas a CNR itself contains probative evidence.  With a certificate of authenticity, little would be

---

common law exceptions for public records and business records.  A leading treatise places certificates of authenticity under the heading of "Official Statements," rather than "Regular Entries." 5 Wigmore, supra, at xii-xiv, xvi-xviii.  This does not affect our general discussion below.  The question posed here is not whether documents certifying the authenticity of business or official records are an exception to Crawford.

[10] The government argues that both certificates of authenticity and CNRs rely on records that themselves would be admissible at trial.  See United States v. García, 452 F.3d 36, 42 (1st Cir. 2006) (holding that criminal defendants have no right to confront officials who "routinely record warrants of deportation").

gained from cross-examining the authenticator as to how diligent he was in searching for the authenticated document; the production of the authenticated document speaks for itself, as it is available to be examined at trial. By contrast, a defendant might benefit from cross-examining the maker of the CNR as to the details of the search, and from exploring the possibility that a record has been overlooked, misfiled, or otherwise lost.

Further, the defendant argues that even if certificates of authenticity were admissible at common law, it is clear that CNRs were not so admissible, and this was so perhaps for reasons unrelated to the rule of completeness.[11] 5 <u>Wigmore</u>, <u>supra</u>, § 1678(7), at 867. As Earle points out, two federal cases from the early twentieth century clearly express hearsay concerns about the admission of CNRs. <u>Id.</u> at 867 n.3; <u>see</u> <u>United States</u> v. <u>Bass</u>, 64 F.2d 467, 470 (7th Cir. 1933) ("Proof that something is not to be found in the records may not be made by a mere certificate of the

---

[11] At common law, the rule of completeness

> require[d] that the whole of a document be shown forth, in proving any part of it, so that the tribunal may judge better of the significance of the whole and the precise interpretation of any part. At common law, therefore, it was entirely settled that no custodian had authority to certify any less than the entire and literal terms of the original -- in short, a copy in the strict sense of the word; and the rule was applied to all varieties of documents.

5 <u>Wigmore</u>, <u>supra</u>, § 1678(6), at 863.

custodian, but must be shown by testimony with opportunity to cross-examine."); United States v. Bukis, 17 F. Supp. 77, 78 (E.D. Pa. 1936) ("[P]roof that something is not to be found in the records may not be made by a mere certificate of the custodian, but is a matter of fact which must be shown by the testimony of a person who has searched the records, with an opportunity to cross-examine.").

Earle also attacks the government's underlying assumption that little weight should be given to the fact that the CNR was prepared to be used in litigation. He cites to Crawford, which states: "We cannot agree with THE CHIEF JUSTICE that the fact '[t]hat a statement might be testimonial does nothing to undermine the wisdom of one of these [hearsay] exceptions.'" 541 U.S. at 56 n.7 (alterations in original) (quoting id. at 74 (Rehnquist, C.J., concurring in judgment)).

Given both the common law and the Supreme Court's limited guidance on what is testimonial, we cannot easily dismiss either Earle's or the government's arguments as without merit. In the end, we do not decide the Confrontation Clause issue because it is not necessary to the decision. On the facts of this case, if there were any error in admitting the CNR, the government has met its burden of showing that any such error was harmless beyond a reasonable doubt.

When evaluating harmlessness, we consider a number of factors including the importance of the challenged statement in the prosecution's case, whether the statement was cumulative, the presence or absence of evidence corroborating or contradicting the statement on material points, the extent of cross-examination otherwise permitted, and the overall strength of the prosecution's case. See Olden, 488 U.S. at 233; Dolinger v. Hall, 302 F.3d 5, 12 n.6 (1st Cir. 2002). We will affirm a conviction if the "contested . . . statements . . . were at best cumulative of other compelling proof that [the defendant] committed the charged [crime]." United States v. Bartelho, 129 F.3d 663, 670 (1st Cir. 1997).

Ruth Jones' statement in the CNR -- that "after a diligent search relating to [Earle's A-file] . . ., no evidence is found to exist in the records that the defendant obtained consent . . . to reapply for admission in the United States" -- is simply cumulative of Sassone's testimony. Sassone's testimony was recounted earlier. The cumulative nature of the CNR is self-evident.[12]

Moreover, Earle had, and took, the opportunity to cross-examine Sassone about the topics on which he was unable to cross-examine Jones. Defense counsel asked Sassone about her own review

---

[12] At oral argument, Earle's counsel suggested that Sassone's statements and Jones' CNR were distinguishable because Jones was a more senior official. Jones' seniority has no bearing on the harmless error analysis. It does not make the contents of the CNR any less cumulative of Sassone's testimony.

of the A-file and the computer indices, the misfiling of documents, the possible existence of multiple A-files, the outsourcing of tasks to private contractors, and the destruction of official documents. Defense counsel also questioned Sassone about the Record Services Branch's practices for preparing CNRs, in particular Sassone's understanding that Jones would not have reviewed the A-file herself. Further, the defense referred to key parts of its cross-examination of Sassone in its closing arguments, making largely the same points.

"Because the challenged statement[] merely duplicated what was otherwise properly admitted, . . . there is no 'reasonable possibility' that the challenged statement[], if [it was] erroneously admitted, influenced the verdict against [the defendant]." Bartelho, 129 F.3d at 670 (quoting United States v. Rivera-Santiago, 107 F.3d 960, 967 (1st Cir. 1997)). The government has proved beyond a reasonable doubt that Earle would have been convicted even if the CNR had not been admitted into evidence.

B. Jury Instruction on Lawfulness of Deportation

We review de novo "a properly preserved objection to the failure to give a requested jury instruction." United States v. Buttrick, 432 F.3d 373, 376 (1st Cir. 2005), cert. denied, 126 S. Ct. 2861 (2006).

Defense counsel objected to the lack of an instruction stating that the government had the burden of proving that the deportation was a <u>lawful</u> deportation. The district court overruled the objection, noting that the Supreme Court had decided in <u>United States</u> v. <u>Mendoza-Lopez</u>, 481 U.S. 828 (1987), that lawfulness of deportation was not an element of the offense defined at 8 U.S.C. § 1326. <u>Id.</u> at 834-37.

The district court did instruct the jury that there were four elements of the crime, each of which the government had to prove beyond a reasonable doubt: (1) that Earle was an alien at the time alleged in the indictment, (2) that he had previously been deported from the United States, (3) that he was later found to be in the United States, and (4) that he had not received express consent from either the Attorney General or the Secretary of DHS to reenter the United States. On the second element, the district court explained that "the Government needs to prove beyond a reasonable doubt that the deportation proceeding actually occurred and that the end result was that the defendant was, in fact, deported."

On appeal, Earle concedes that the Supreme Court has previously held that lawfulness of deportation is not an element of § 1326. He argues, however, that subsequent Supreme Court cases such as <u>Apprendi</u> v. <u>New Jersey</u>, 530 U.S. 466 (2000), require the issue of lawfulness to be proven to a jury beyond a reasonable

doubt.  Apprendi does not, however, require a jury to be instructed that the government bears the burden of proving something that is not an element of a crime.  Id. at 477.

The defendant's argument is without merit.  In an illegal reentry prosecution, the lawfulness of deportation simply is not an element of the offense.  Earle was not entitled to a jury instruction on the lawfulness of deportation.

### III.  Asserted Sentencing Errors

### A.  Guidelines Enhancement for Deportation After Conviction of a Prior Crime of Violence

This court reviews the district court's interpretation of the Sentencing Guidelines de novo.  United States v. Alli, 444 F.3d 34, 37 (1st Cir. 2006).  We review the district court's factual findings for clear error.  Id.

At Earle's sentencing, defense counsel objected to a 16-level enhancement pursuant to section 2L1.2 of the Sentencing Guidelines, on the basis that Earle's prior state conviction was not for a crime of violence.  Section 2L1.2(b)(1) provides: "If the defendant previously was deported, or unlawfully remained in the United States, after -- (A) a conviction for a felony that is . . . a crime of violence . . . increase [offense level] by 16 levels."  The Guidelines in turn define "crime of violence" as

> any of the following: murder, manslaughter, kidnapping, aggravated assault, forcible sex offenses, statutory rape, sexual abuse of a minor, robbery, arson, extortion, extortionate extension of credit, burglary of a dwelling,

-22-

> or <u>any offense under federal, state, or local</u>
> <u>law that has as an element the use, attempted</u>
> <u>use, or threatened use of physical force</u>
> <u>against the person of another</u>.

<u>Id.</u> cmt. n.1(B)(iii) (emphasis added).  The district court held that Earle had pled guilty to a state crime, Mass. Gen. Laws ch. 265, § 15A(b), that had as an element of the offense the use or threatened use of physical force against another person.

On appeal, Earle argues that the December 1997 criminal complaint against him in state court did not charge a crime against a person, but only against an entity, the Commonwealth.  He relies on language in the complaint, which stated that he "did, by means of a dangerous weapon, MOTOR VEHICLE, assault and beat <u>COMM OF</u> <u>MASS</u>, in violation of G.L. c.265, s.15A" (emphasis added).

The parties agree that the approach used in <u>Taylor</u> v. <u>United States</u>, 495 U.S. 575 (1990), is applicable to U.S.S.G. § 2L1.2.  <u>See</u> <u>United States</u> v. <u>Londono-Quintero</u>, 289 F.3d 147, 151 n.3 (1st Cir. 2002) (applying <u>Taylor</u> approach in considering claim that a state conviction did not qualify as an "aggravated felony").

In <u>Taylor</u>, the Supreme Court held that a district court should follow a two-step analysis when determining whether a previous burglary conviction under state law qualifies as a predicate offense under the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e)(1).  First, the district court should determine, based on the definition of the state offense, whether conviction under the state statute "necessarily implies that the defendant has

-23-

been found guilty of all the elements of generic burglary." 495 U.S. at 599. If not, then the district court may consider the charging document and the jury instructions in determining whether the conviction was in fact for generic burglary. Id. at 602.

In Shepard v. United States, 544 U.S. 13 (2005), the Court considered previous convictions obtained through guilty pleas and held that a district court, when considering predicate offenses under the ACCA, "is generally limited to examining the statutory definition, charging document, written plea agreement, transcript of plea colloquy, and any explicit factual finding by the trial judge to which the defendant assented." Id. at 16.

We begin with the statutory definition. The version of Mass. Gen. Laws ch. 265, § 15A in effect in 1997 contained two subsections. Subsection (b) set out the appropriate punishment for "[w]hoever commits assault and battery upon another by means of a dangerous weapon." Mass. Gen. Laws ch. 265, § 15A(b) (2000) (emphasis added). The statutory definition admits to no interpretation other than a crime that involves the use of physical force against another person. Id.; see also Commonwealth v. Ford, 677 N.E.2d 1149, 1151 (Mass. 1997) (noting that, under § 15A, a defendant charged with assault and battery must have either used "intentional and unjustified . . . force upon the person of another" or intentionally committed "a wanton or reckless act . . . causing physical or bodily injury to another" (quoting Commonwealth

-24-

v. Burno, 487 N.E.2d 1366, 1368-69 (Mass. 1986)) (internal quotation marks omitted)).

The dispute here is whether the district court erred in relying on the state statutory definition of the crime, Mass. Gen. Laws ch. 265, § 15A(b), rather than on the face of the complaint. Although the criminal complaint technically charged Earle with assault and battery with a dangerous weapon against the Commonwealth of Massachusetts, the state court gave short shrift to the argument that the complaint did not properly charge Earle with a crime under § 15A(b). Earle, hoping to overturn his conviction, made this same argument before the state court, and it was rejected. As there is no indication that U.S.S.G. § 2L1.2 contemplates collateral attack, we will not question the state court's conclusion that Earle was properly convicted under § 15A(b). Cf. Custis v. United States, 511 U.S. 485, 491-93 (1994).

The district court committed no error in applying the 16-level enhancement pursuant to U.S.S.G. § 2L1.2.[13]

B. Applicability of 8 U.S.C. § 1326(b)(2) to Sentencing

We review legal conclusions of a sentencing court de novo. United States v. González-Vélez, 466 F.3d 27, 40 (1st Cir.

---

[13] Since the district court's decision was well supported by the state statutory definition, we need not consider the defendant's arguments concerning the district court's passing reference to the police report of the underlying incident.

2006). However, if the defendant fails to preserve a sentencing issue, we review only for plain error. United States v. Savarese, 385 F.3d 15, 21 (1st Cir. 2004). Further, if the defendant affirmatively waives an issue, that issue generally may not be reviewed. See United States v. Hansen, 434 F.3d 92, 101 (1st Cir. 2006); United States v. Rodriguez, 311 F.3d 435, 437 (1st Cir. 2002). We bypass the government's waiver argument.

Earle argues that his Sixth Amendment rights were violated when the district court sentenced him in excess of the 24-month maximum sentence provided for by 8 U.S.C. § 1326(a). Earle acknowledges that, under 8 U.S.C. § 1326(b)(2), the maximum sentence under § 1326 is 20 years if the defendant's prior removal "was subsequent to a conviction for commission of an aggravated felony." He argues that the government was required to prove the commission of an aggravated felony to the jury beyond a reasonable doubt. For support, he cites Apprendi, 530 U.S. at 520 (Thomas, J., concurring), and United States v. Booker, 543 U.S. 220, 231-33 (2005).

Earle's argument is foreclosed by Almendarez-Torres v. United States, 523 U.S. 224 (1998). In Almendarez-Torres, the Supreme Court held that the fact of prior conviction for sentencing purposes need not be proved to a jury beyond a reasonable doubt. Id. at 226-27 (considering the "aggravated felony" penalty provision under 8 U.S.C. § 1326(b)(2)). This court has repeatedly

stated post-<u>Apprendi</u> that we are bound by <u>Almendarez-Torres</u> until the Supreme Court expressly overrules it. <u>See, e.g.</u>, <u>United States v. DeLeon</u>, 444 F.3d 41, 55 (1st Cir. 2006); <u>United States v. Jiménez-Beltre</u>, 440 F.3d 514, 520 (1st Cir. 2006) (en banc); <u>United States v. Ivery</u>, 427 F.3d 69, 75 (1st Cir. 2005). Earle has preserved the issue for further review.

## IV. <u>Conclusion</u>

For the foregoing reasons, we <u>affirm</u> Earle's conviction and sentence.