# United States Court of Appeals
## For the First Circuit

No. 23-1871

UNITED STATES,

Appellee,

v.

JOSÉ CARTAGENA, t/n José Ruben Cartagena-Rodríguez,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Pedro A. Delgado-Hernández, U.S. District Judge]

Before

Aframe, Hamilton,* and Thompson,
Circuit Judges.

Luis Rafael Rivera-Rodriguez, with whom Luis Rafael Rivera
Law Offices, was on brief, for appellant.

Harmeet K. Dhillon, Assistant Attorney General, with whom W.
Stephen Muldrow, United States Attorney, Jesus A. Osete, Deputy
Assistant Attorney General, and Jason S. Lee and Brant S. Levin,
Appellate Attorneys, Civil Rights Division, U.S. Department of
Justice, were on brief, for appellee.

_____

* Of the United States Court of Appeals for the Seventh
Circuit, sitting by designation.

April 15, 2026

**HAMILTON**, **Circuit Judge**. Four police officers brutalized a teenage boy during and after an arrest. Then they covered it up. Federal prosecutors brought civil rights and obstruction charges, securing guilty pleas from three officers. A jury convicted the fourth, Defendant José Cartagena, on all counts. At trial, however, the Government introduced into evidence a hearsay statement from the victim, who was never available to the defense for cross-examination, contrary to the defendant's rights under the Confrontation Clause of the Sixth Amendment. We vacate his conviction on the one count for which that statement was important to the Government's case. We affirm the other convictions as supported by sufficient evidence and remand for further proceedings consistent with this opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

We relate the facts in the light most favorable to the verdicts. United States v. Buoi, 84 F.4th 31, 34 (1st Cir. 2023). Because there are as many variations on the story as there were people telling it, if not more, we try to avoid extraneous details.

In November 2014, Defendant Cartegena was an officer in a police drug unit. He was on patrol in Canóvanas, Puerto Rico, with fellow officers in the Carolina precinct's drug unit, Jimmy Davis, Carlos Nieves, and Shylene Lopez. The officers encountered two young men on the side of the road. Suspicious that a drug deal was occurring, the officers tried to confront them. The

youths fled, one on foot and the other, 17-year-old Calep Carvajal, on a bicycle. Nieves shot Carvajal in the back. Cartagena gave chase on foot, caught up to Carvajal, tackled him to the ground, and handcuffed him. Count 1 of the indictment charged that Cartagena violated 18 U.S.C. § 242 in the arrest by using unlawful force in violation of the Fourth Amendment by pistol-whipping Carvajal in the back of the head while he lay on the ground, unarmed and not resisting.

The assaults continued as the officers put Carvajal in the squad car, with his hands cuffed behind his back, to take him to a police station. When Carvajal leaned forward to avoid "smacks and hits" coming from Lopez and Nieves, who were seated beside him, Cartagena turned around from the front passenger seat and, as charged in Count 2 of the indictment, also under § 242, twice struck Carvajal hard in the face.

After arriving at the station, Davis and Lopez took Carvajal into an office where he was beaten some more. Meanwhile, Cartagena and Nieves discussed how to cover up what they had done. Each wanted the other to take responsibility for handling the administrative side of the case. In the end, Cartagena wrote the use-of-force report. As charged in Count 6 of the indictment under 18 U.S.C. § 1519, he falsified that report by intentionally omitting that Carvajal had been shot, pistol-whipped, and repeatedly punched. He wrote instead that the officers had given

"verbal warnings." In the narrative section, Cartagena explained Carvajal's injuries as having been caused by losing control of his bicycle and falling to the ground.

Carvajal was charged with and later pled guilty to drug possession in a Commonwealth court for a small bag of drugs found near him. As charged in Count 7 of the indictment, 18 U.S.C. § 1512(b)(3), Cartagena obstructed justice by intentionally lying to the juvenile prosecutor that Carvajal might falsely claim during those proceedings that the officers assaulted him, even though his injuries, Cartagena falsely assured the prosecutor, were "exclusively" from falling off the bicycle.

Around a year later, Cartagena reached out to the Federal Bureau of Investigation to report misconduct committed by his colleagues in the Carolina drug unit, including the incident involving Carvajal. Cartagena was not the first to report the Carvajal incident and its cover-up to the FBI. The FBI had apparently already located Carvajal and had him undergo a medical examination in which he told a doctor that he had been shot and that his head wound was caused by a blow from a pistol. Across a series of four interviews, Cartagena told Agents Brian Doyle and Ronnie Bobbitt that Nieves had shot Carvajal without justification, that he himself had hit Carvajal in the back of the head with his gun when the teenager tried to stand up as Cartagena arrested him, that Davis struck Carvajal as he tried to apologize

for fleeing just before being put in the car, and that he himself had struck Carvajal in the face in the car when he leaned forward to avoid blows from Lopez and Nieves.

In August 2016, a grand jury in the District of Puerto Rico returned a seven-count indictment against Cartagena, Nieves, Davis, and Lopez. Cartagena faced Counts 1, 2, 6, and 7 as set forth above, while Nieves, Davis, and Lopez faced Counts 3, 4, and 5, respectively, each under § 242, for their assaults. The other three defendants reached plea agreements. Cartagena also reached a plea agreement but was later allowed to withdraw his plea. He was convicted on all counts and sentenced to concurrent terms of 84 months in prison on each count. He appeals his convictions.

## II. SUFFICIENCY OF THE EVIDENCE

Cartagena first challenges the sufficiency of the evidence against him. Although he moved for a judgment of acquittal at the close of the Government's case under Federal Rule of Criminal Procedure 29(a), he failed to renew that motion after the verdicts under Rule 29(c). Our review is therefore strictly limited. Under these circumstances, we "may not intercede except to prevent a clear or gross injustice." United States v. Hernández-Román, 981 F.3d 138, 143 (1st Cir. 2020). No such injustice exists if the evidence, viewed in the light most favorable to the verdicts, is sufficient to support the convictions. Id.; United States v. Van Horn, 277 F.3d 48, 54 (1st

Cir. 2002). The Government asserts that Cartagena has not just forfeited his sufficiency challenge but in fact waived it by failing to argue the "clear or gross injustice" standard on appeal, a point to which Cartagena has not responded. We nonetheless choose to consider the challenge because we can so easily reject it on the merits.

Counts 1 and 2 charged Cartagena with deprivation of rights under color of law for pistol-whipping Carvajal during the arrest and punching him during the car ride, respectively, in violation of 18 U.S.C. § 242. The Government had to prove that Cartagena: "1) acted under color of law, 2) deprived [Carvajal] of a constitutional right, 3) acted willfully, and as a result, 4) [Carvajal] suffered bodily injury." See United States v. Pagán-Ferrer, 736 F.3d 573, 591 n.8 (1st Cir. 2013). To violate the Fourth Amendment, the use of force during an arrest must be "unreasonable under the circumstances." Jennings v. Jones, 499 F.3d 2, 11 (1st Cir. 2007), citing Graham v. Connor, 490 U.S. 386, 397 (1989).

The substance of Cartagena's challenge on these counts is that the Government's witnesses "could not establish with certainty who actually used physical force against Calep Carvajal." Certainty is not the standard. A sufficiency challenge tests what a reasonable jury could have found beyond a reasonable doubt from the evidence before it. United States v. Meises, 645

F.3d 5, 13 (1st Cir. 2011). "The testimony of a single witness," even one with credibility problems, can be legally sufficient to prove a fact. Id. at 12.

As to Count 1, Lopez testified that she saw Cartagena hit Carvajal "with the butt of the firearm in the back of [his] head" while he "wasn't doing anything" to resist arrest. In addition, Agent Doyle testified that during their final interview, Cartagena confessed to striking Carvajal with his firearm while ordering him to stay on the ground and physically demonstrated his actions. As to Count 2, Agent Doyle testified that Cartagena confessed to giving Carvajal a "closed-hand palm strike" where his "knuckles impacted the forehead" -- that is, a punch to the face -- a strike so hard that Cartagena's hand was still in pain several days later. Another officer, then the head of the Carolina drug unit, testified similarly that Cartagena had told him several months after the arrest that he had "hit [Carvajal] with his hand on his head" and that the blow had caused him to "tilt[] to the front." This testimony was legally sufficient to convict Cartagena for pistol-whipping and punching Carvajal while he was in custody and not resisting arrest.

Counts 6 and 7 charged Cartagena with, respectively, filing a report containing false statements and omissions about Carvajal's arrest in violation of 18 U.S.C. § 1519 and obstructing justice by lying to the prosecutor in Carvajal's case in violation

of 18 U.S.C. § 1512(b)(3). For Count 6, under § 1519, the Government had to prove that Cartagena: (1) knowingly falsified (2) a document (3) with the intent to impede, obstruct, or influence the investigation of a matter within federal jurisdiction. See United States v. Katakis, 800 F.3d 1017, 1023 (9th Cir. 2015) (describing elements); see also United States v. Baugh, 588 F. Supp. 3d 140, 149 (D. Mass. 2022) ("The creation of a document with a material omission is a falsification within the meaning of § 1519."), citing United States v. Singh, 979 F.3d 697, 716 (9th Cir. 2020). For Count 7, under § 1512(b)(3), the Government had to prove that Cartagena "knowingly and willfully (1) engage[d] in misleading conduct toward another person, (2) with the intent to hinder, delay or prevent the communication of information to a federal official, (3) about the commission or the possible commission of a federal crime." United States v. Ronda, 455 F.3d 1273, 1284 (11th Cir. 2006).[1]

The substance of Cartagena's challenge here is his intent. He does not dispute that he filed the false police report, nor that he lied to the juvenile prosecutor. Rather, Cartagena argues, no reasonable jury could have found that he intended to obstruct justice because he was coerced through threats of violence

---

[1] The underlying federal crimes for Counts 6 and 7 were Cartagena's own unlawful uses of force as charged in Counts 1 and 2, not Carvajal's drug charges, which were brought in Commonwealth court.

- 9 -

from the other officers in his unit, per his own testimony, and eventually reported them to federal authorities as a confidential informant.

The coercion defense effectively concedes that Cartagena's purpose in filing the false reports and lying to the prosecutor was to carry out a cover-up, the only plausible reason for which his fellow officers might have tried to coerce him. Acting to save one's own skin does not negate a mens rea of "knowing" or "willful" conduct. Rather, this contention is a duress defense in disguise. See Dixon v. United States, 548 U.S. 1, 6 (2006) ("The duress defense . . . may excuse conduct that would otherwise be punishable, but the existence of duress normally does not controvert any of the elements of the offense itself.").

The court instructed the jury on duress (or "justification"), and Cartagena does not argue that the instruction was improper. "Duress is an affirmative defense requiring proof that the defendant committed a crime as a result of (1) an immediate threat of serious bodily injury or death (2) that the defendant reasonably believed was true, (3) without a reasonable opportunity to escape or frustrate the threat." United States v. Diaz-Castro, 752 F.3d 101, 108 (1st Cir. 2014). Here, the jury was entitled to reject the duress defense three times over by: (a) discrediting Cartagena's testimony that the threats were made at all; (b) disbelieving that any such threats

were sufficiently imminent or severe; and/or (c) disbelieving that a veteran police officer who is five feet, ten inches tall, weighs 255 pounds, bench presses 520 pounds, and is trained in the use of firearms lacked a reasonable opportunity to protect himself.

Second, cooperating with federal authorities after a crime is complete (here, nearly a year later) does not wipe the slate clean. Neither § 1512(b)(3) nor § 1519 contains a safe-harbor provision for remorseful violators. Cartagena completed the offenses in Counts 6 and 7 as soon as he filed the false report and lied to the prosecutor. His later cooperation might have been relevant for sentencing, for example, but it did not undermine the evidence of his guilt. Sufficient evidence supported each of Cartagena's convictions.

### III. THE CONFRONTATION CLAUSE

Cartagena also contends his Confrontation Clause rights under the Sixth Amendment were violated when the Government introduced into evidence a statement that Carvajal made during a medical examination. Although Carvajal spoke to the FBI about ten months after his arrest, the Government was unable to locate him by the time of trial, and he did not testify. Because Cartagena preserved the issue by objecting at trial, we review this challenge de novo. See United States v. Ramos-González, 664 F.3d 1, 3-4 (1st Cir. 2011).

- 11 -

We begin by reviewing the challenged testimony. The Government's medical expert, Dr. Yocasta Brugal, testified to the cause of Carvajal's head wound. She called it inconsistent with falling off a bike and consistent with a blow from behind by a blunt object, possibly a handgun, in accordance with the Government's theory. Cartagena, by contrast, asserted at trial that Officer Lopez had caused the wound by beating Carvajal at the police station. Cartagena claimed he had merely "placed" his handgun on the back of Carvajal's head, which he described as a "touch[]," not a "strike." Dr. Brugal said on cross-examination that the wound was also consistent with a blow from several other types of blunt objects.

To arrive at her conclusion that Carvajal's head wound was indeed caused by a blow from a handgun, Dr. Brugal spoke with the prosecution and the FBI and examined photographs and medical records from Carvajal's visit to the emergency room. She also physically examined and spoke with Carvajal. Critical here, Dr. Brugal testified that Carvajal told her the cause of his head wound, a statement she relayed to the jury:

> Q. And now moving on to the interview that you said that you had with Calep. Very briefly, if you could describe some of the information that he provided you that was relevant, very briefly, to your assessment as to how he received his injuries.
>
> A. Okay. From what I remember, right, he told me that he received a bullet wound in his back while he was riding a bicycle, and that

- 12 -

he received a trauma on his head that he identified had been produced by the butt of a revolver.

Cartagena argues that this testimony violated his Sixth Amendment right to confront the witnesses against him and that this error was prejudicial to his conviction on Count 1 (but not any other), meaning we must vacate that conviction and remand for further proceedings.  We agree.

## A.  CRAWFORD AND "CONTEXT"

The Confrontation Clause of the Sixth Amendment bars the admission in a criminal trial of "testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination."  Crawford v. Washington, 541 U.S. 36, 53-54 (2004).  That rule "applies in full to forensic evidence," including testimonial out-of-court statements relied upon by a testifying expert to support her in-court opinion.  Smith v. Arizona, 602 U.S. 779, 783, 803 (2024).  A conviction obtained in reliance on such evidence "must be vacated unless the government demonstrates that the error was harmless beyond a reasonable doubt."  Ramos-González, 664 F.3d at 4.

"Crawford analysis generally requires a court to consider two threshold issues: (1) whether the out-of-court statement was hearsay, and (2) whether the out-of-court statement was testimonial."  United States v. Earle, 488 F.3d 537, 542 (1st

- 13 -

Cir. 2007). The Government does not dispute that Carvajal's statement was testimonial, so we address only whether it was hearsay.

An out-of-court statement is hearsay if it is offered for the truth of the matter asserted. Fed. R. Evid. 801(c). The Confrontation Clause does not apply to statements offered for other purposes. Crawford, 541 U.S. at 59-60 n.9, citing Tennessee v. Street, 471 U.S. 409, 414 (1985). That path to admission does not allow courts to accept reflexively the Government's assertion that a statement is not offered for its truth but simply "provides context for other admissible evidence." United States v. Maher, 454 F.3d 13, 22 (1st Cir. 2006). For example, a defendant's admissions, tape-recorded by an informant, may be given context by admitting the intervening lines of dialogue of the non-testifying informant. United States v. Walter, 434 F.3d 30, 33–35 (1st Cir. 2006). But we have generally not allowed police to "narrate the course of their investigations" by telling the jury who told them what when. See Maher, 454 F.3d at 22-23, quoting United States v. Silva, 380 F.3d 1018, 1020 (7th Cir. 2004). Too-ready deference to the Government's stated reasons for offering evidence would "go far toward abrogating" if not "eviscerate the constitutional right to confront and cross-examine one's accusers." Id. at 23, quoting Silva, 380 F.3d at 1020.

On appeal, the Government minimizes Carvajal's statement by claiming it was "referenced in passing only to show one of many bases for the expert's opinion." The record belies that characterization. The sidebar on Cartagena's objection takes up nearly six full pages of the trial transcript. As soon as Dr. Brugal testified that she had spoken to Carvajal and before she revealed what he had said, Cartagena objected on Confrontation Clause (and hearsay) grounds. The Government responded: "I just want to establish that she interviewed Calep. I'm not interested in back-dooring a whole lengthy description." Recall that Dr. Brugal did not testify only that she had spoken to Carvajal. She testified more fully that he said he was struck in the head with a handgun. The Government went on to argue: "[A]n expert witness is allowed to testify as to what formed the basis for her expert opinion so the jury can analyze whether or not they believe her opinion is sound or not." Indeed, an expert may rely on inadmissible facts in forming an opinion and may even disclose otherwise inadmissible facts to the jury "if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect." Fed. R. Evid. 703.

The Government's reliance on Rule 703 defeats itself. Carvajal's statement could have helped the jury evaluate Dr. Brugal's opinions only if it were true. If instead Carvajal did not remember how he received the head wound, or if he lied and it

- 15 -

really was a blow from Officer Lopez or some other cause, then the statement would have hindered the jury's ability to assess Dr. Brugal's opinions because it would have given jurors false confidence in her conclusions. The statement was offered for the truth of the matter asserted and constituted hearsay. The Government does not dispute that the statement was testimonial, and Cartagena never had an opportunity to "test[]" the statement "in the crucible of cross-examination." Crawford, 541 U.S. at 61. The Confrontation Clause therefore barred its admission.

## B. PREJUDICE

We must vacate Cartagena's conviction as to Count 1 unless the Government demonstrates that the Confrontation Clause error was harmless beyond a reasonable doubt. Ramos-González, 664 F.3d at 6. "In evaluating harmlessness, we consider several factors, including whether the challenged statements were central to the prosecution's case; whether the statements were merely cumulative of other, properly admitted evidence; the strength of corroborating or contradicting evidence; the extent to which cross-examination was permitted; and the overall strength of the case." Id. at 6-7, citing Earle, 488 F.3d at 546.

Contrary to the Government's assertions at oral argument, the harmless-error inquiry required here is not the same as asking whether the properly admitted evidence was legally sufficient for a conviction. (In fact, we have already rejected

Cartagena's sufficiency challenges, and we did so without relying on Dr. Brugal's testimony at all.) A standard asking the court to "simply imagine[] what the record would have shown" both "ignores the significant prejudicial effect the error can have on a jury's ability to evaluate fairly the remaining evidence" and would "offer[] prosecutors no real incentive to comply with the Constitution so long as any evidence not admitted in error is legally sufficient to sustain a conviction." Jones v. Basinger, 635 F.3d 1030, 1053 (7th Cir. 2011). The standard is clear. The harmless nature of the error must be clear beyond reasonable doubt. Ramos-González, 664 F.3d at 6.

In this case, the harmlessness factors essentially merge into one observation: Dr. Brugal was easily the most trustworthy witness who testified against Cartagena as to Count 1. As the Government framed the case at closing, the verdict on Count 1 would depend not on whether the jury thought a pistol-whipping was reasonable force but on whether it happened at all, a question about which jurors had heard directly contradictory testimony:

> Now, Calep's head injury. The defendant has to deny that. You see, if the defendant doesn't deny he pistol-whipped Calep, he knows it's a guaranteed conviction. He has to deny that. He gets on the witness stand and the most he's willing to say, the defendant, yes -- it was on cross -- my pistol touched his head. That's the closest he was willing to admit. Because that's a fact he cannot admit. He has to deny that on the witness stand.

- 17 -

Recall that Cartagena had testified that he did not "strike" Carvajal, and he suggested the wound came from Lopez having later beaten the teenager with a baton at the station. By contrast, Lopez testified she saw Cartajena do it, Agent Doyle testified that Cartajena not only confessed but also demonstrated how he had done it, and Dr. Brugal testified that Carvajal told her he was struck with a handgun.

Dr. Brugal is the longtime Dean and President of the San Juan Bautista School of Medicine and has won several awards for her teaching and contributions to the island, including her work on high-profile cases. She has, by her count, handled well over fifteen thousand forensic cases and testified as an expert witness "two to three times a week [for] 30 years."

The Government's other witnesses on Count 1 had serious credibility problems. Less than a year after Carvajal's arrest, Lopez was indicted on several unrelated charges for stealing drugs and money from criminal suspects and lying to federal agents about having done so. She was being held without bail, missing her children, and facing ten years to life before she agreed to cooperate with the Government and to testify against Cartagena in this case, eventually reaching a plea agreement with a recommended sentence of 57 to 71 months for those charges. She was also indicted alongside Cartagena in this case, and at the time of trial, she had pled guilty to and was awaiting sentencing on that

charge.  The jury could have believed Lopez anyway; a witness's credibility issues will not win a sufficiency challenge.  Meises, 645 F.3d at 12.  Yet, based on Lopez's circumstances as disclosed during trial, we have more than a few doubts about whether the jury actually believed her.  See United States v. Gomes, 177 F.3d 76, 81 (1st Cir. 1999) (noting "the cooperation agreement already gave the jury an ample and more solid reason to question [the witness's] testimony as the fruit of lenient treatment").

Agent Doyle also had credibility issues.[2]  The first is that Doyle's testimony relied on his memory of an interview conducted six years before trial and on confidential human source reports written by himself and interview reports written by his fellow agent, Bobbitt, both of which Doyle used to prepare for his testimony.  Indeed, Doyle agreed that "there are things from this case that you don't recall," the reason being how long ago the interviews took place.  One report was used to refresh Doyle's recollection on the stand; none were admitted into evidence.  The reports written by Bobbitt were examples of an "FD-302" (or a "302"), "a form used by FBI agents to report or summarize

---

[2]  At oral argument, Cartagena's counsel identified Agent Doyle's chief credibility issue as the possibility that he became frustrated with Cartagena for not disclosing everything in the first interview.  Our review of Cartagena's cross-examination of Doyle does not reveal any lines of questioning substantiating bias. Cartagena himself testified that, to his knowledge, Doyle had "nothing against [him], personally" and always treated him "respectfully" and "professionally."

interviews that FBI agents conduct. It contains information from the notes taken during the interview, typically by a non-primary, or non-interviewing agent." Vidrine v. United States, 846 F. Supp. 2d 550, 583 n.74 (W.D. La. 2011). None of the interviews were recorded, despite prosecutors having already decided to charge Cartagena by the third interview.[3]

More than once, Doyle testified to the exact words used in that conversation from over six years before. Most important here, he testified that Cartagena told him he "struck" Carvajal with the gun and that during the demonstration he (Doyle) asked whether Cartagena "hit" Carvajal at the same time as or before ordering him not to get up. The difference between that testimony and Cartagena's testimony that the words he used were "placed" or "touched" matters. The Fourth Amendment prohibits only unreasonable uses of force. See Jennings, 499 F.3d at 11, citing Graham, 490 U.S. at 397.

Reliance on interview reports to testify to the exact words used by a witness six years earlier gives us reason to pause. "[T]he 302 is often characterized as more of a summary of the agent's memory and understanding of what a witness said, rather

---

[3] The FBI has used a substantially similar procedure for completing 302s since the 1950s, although custodial interviews are now customarily recorded electronically as well. See United States v. Harrison, 524 F.2d 421, 425-26 (D.C. Cir. 1975); Dep't of Justice, New Department Policy Concerning Electronic Recording of Statements, 128 Harv. L. Rev. 1552, 1552 (2015).

than a memorandum of what the witness actually said during the interview." Vidrine, 846 F. Supp. 2d at 583 n.74 (emphasis in original). That's why 302s are often held not to be discoverable Jencks Act material as to statements made by the interviewee. They record, generally speaking, not a "substantially verbatim recital of an oral statement made by said witness." 18 U.S.C. § 3500(e)(2); e.g., United States v. Gonzalez-Melendez, 594 F.3d 28, 36 (1st Cir. 2010) (affirming denial of disclosure; noting the "somewhat scattered manner of transcription" from scraps of paper to 302 casts doubt on "substantially verbatim" nature of statements); United States v. Derrick, 163 F.3d 799, 831 (4th Cir. 1998) ("The words recorded in the FBI 302 are the FBI agent's characterization of what [the witness] said, not the words that [the witness] actually spoke. FBI 302s . . . are not intended to be verbatim recitations of the interviewee's statements."); see also Palermo v. United States, 360 U.S. 343, 350 (1959) (noting Jencks Act does not apply to "interpretations and impressions" and does not "allow the defense to use statements to impeach a witness which could not fairly be said to be the witness's own rather than the product of the investigator's selections, interpretations, and interpolations").

Another critical moment exposing Doyle's credibility issues came when, over an objection by Cartagena, Doyle got off the witness stand to demonstrate for the jury how Cartagena had

demonstrated the arrest to him. To be clear, at trial, Doyle played Cartagena while an FBI analyst played Doyle, who during the original demonstration six years prior had been playing Carvajal – like something out of Shakespeare.[4]

Agent Doyle had been lying prone with his hands behind his back, could not recall how Cartagena was positioned over him, and did not know what part of the gun hit Carvajal's head because he (naturally) "couldn't see the parts of the gun in the back of my own head." He nonetheless testified that the force Cartagena had used "seemed hard." It is not clear how Doyle got that impression. If Doyle could not see how Cartagena was holding the gun during the earlier demonstration, one wonders how he could have estimated the force Cartagena used unless, perhaps, he simply relied on his fellow agent's characterization of the demonstration instead of his own memory. That's of particular concern where, quite understandably, neither Doyle during his testimony nor Cartagena during the original demonstration actually delivered a forceful blow.

The Government itself provided perhaps the best confirmation that Dr. Brugal's testimony was the strongest evidence of Cartagena's guilt as to Count 1 and that the error was

---

[4] Cf. William Shakespeare, <u>As You Like It</u> act. III, sc. 2, ll. 408-09 (Rosalind, in disguise as Ganymede, tells Orlando she will pretend to be Rosalind to cure him of lovesickness).

not harmless.  In closing arguments, immediately after noting that Cartagena had every incentive to lie when he denied pistol-whipping Carvajal, the Government leaned hard on its best remaining witness:

> But how do we know that [Cartagena's testimony] is not believable?  How do we know that Calep was actually pistol-whipped by the defendant?  Well, you know, there was one person, again, that the defense did not call into question their credibility.  There was one witness.  Dr. Brugal.  And what did Dr. Brugal say when she examined Calep and questioned him on how he sustained his injuries?  What did Calep say?  One of his statements: I was shot, and I was hit in the head with a gun.  I was hit in the head with a gun.  That's what Calep told Dr. Brugal.  That testimony is there, it's on the record.  When she was examining him, he said that I was hit in the head with a gun.  He did not say I was hit with a baton.  He never mentioned a baton.  He said I was hit in the head with a gun, after I was shot.  <u>That's huge.</u>

R.595 at 60:25–61:13 (emphasis added).  Indeed.  The Confrontation Clause error was not harmless beyond a reasonable doubt.

## IV. CONCLUSION

We VACATE Cartagena's conviction as to Count 1, AFFIRM as to Counts 2, 6, and 7, and REMAND for further proceedings consistent with this opinion.

- 23 -